IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

          Plaintiff,

    v.

Weyerhaeuser Company

          Defendant.

CIVIL ACTION NO. 1 : 0 5 CV 0 0 0 3

Robert Holmes Bell
Chief, U.S. District Judge

**CONSENT DECREE**
**FOR THE DESIGN AND IMPLEMENTATION OF CERTAIN RESPONSE ACTIONS**
**AT OPERABLE UNIT #4 AND THE PLAINWELL INC. MILL PROPERTY OF THE**
**ALLIED PAPER, INC./PORTAGE CREEK/KALAMAZOO RIVER SUPERFUND SITE**

## TABLE OF CONTENTS

I. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
II. Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
III. Parties Bound . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
IV. Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
V. General Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
VI. Establishment and Use of Certain Site-specific Accounts . . . . . . . . . . . . . . 9
VII. Performance of the Mill RI/FS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
VIII. Performance of the Mill Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
IX. Performance of the OU4 Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
X. Quality Assurance, Sampling, and Data Analysis . . . . . . . . . . . . . . . . . . 21
XI. Access and Institutional Controls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
XII. Reporting Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
XIII. Approval of Plans and Other Submissions . . . . . . . . . . . . . . . . . . . . . . . 25
XIV. Project Coordinators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
XV. Assurance of Ability to Complete Work . . . . . . . . . . . . . . . . . . . . . . . . . . 27
XVI. Certifications of Completion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
XVII. Emergency Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
XVIII Payments by Weyerhaeuser . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
XIX. Consent Decree Funding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
XX. Indemnification and Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
XXI. Force Majeure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
XXII. Dispute Resolution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
XXIII. Stipulated Penalties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
XXIV. Covenant Not to Sue by United States . . . . . . . . . . . . . . . . . . . . . . . . . . 43
XXV. Covenants by Weyerhaeuser . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
XXVI. Effect of Settlement; Contribution Protection . . . . . . . . . . . . . . . . . . . . . 48
XXVII. Access to Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
XXVIII. Retention of Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
XXIX. Notices and Submissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
XXX. Effective Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
XXXI. Retention of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
XXXII. Appendices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
XXXIII. Community Relations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
XXXIV. Modification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
XXXV. Lodging and Opportunity for Public Comment . . . . . . . . . . . . . . . . . . . . 54
XXXVI. Signatories/Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
XXXVII. Final Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

**CONSENT DECREE**
**FOR THE DESIGN AND IMPLEMENTATION OF CERTAIN RESPONSE ACTIONS**
**AT OPERABLE UNIT #4 AND THE PLAINWELL INC. MILL PROPERTY OF THE**
**ALLIED PAPER, INC./PORTAGE CREEK/KALAMAZOO RIVER SUPERFUND SITE**

## I. BACKGROUND

A.     The United States of America ("United States"), on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), filed a complaint in this matter pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606, 9607 (the "Complaint").

B.     The United States' Complaint seeks, *inter alia*: (i) reimbursement of certain costs incurred by the United States for response actions at the 12th Street Landfill Operable Unit #4 ("OU4") and the Plainwell Inc. mill property (the "Mill"), plus interest, at the Allied Paper, Inc./Portage Creek/Kalamazoo River Superfund Site (the "Site") in Allegan and Kalamazoo Counties, Michigan; and (ii) performance of response activities by Weyerhaeuser Company ("Weyerhaeuser") at the Mill and OU4, consistent with the National Contingency Plan, 40 C.F.R. Part 300 (as amended) (the "NCP").

C.     Pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, EPA placed the Site on the National Priorities List, set forth at 40 C.F.R. Part 300, Appendix B, by publication in the *Federal Register* on August 30, 1990, 55 Fed. Reg. 35502.

D.     In July 1993, in response to a release or a substantial threat of a release of hazardous substances at the Site, the Michigan Department of Environmental Quality ("MDEQ") entered into an agreement with several parties, not including Weyerhaeuser, for the performance of a Remedial Investigation and Feasibility Study for, *inter alia*, OU4 (the "OU4 RI/FS") in accordance with 40 C.F.R. § 300.430. The Remedial Investigation ("RI") Report and Final Feasibility Study ("FS") were completed for OU4 in July 1997.

E.      Pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, notice of completion of the FS and proposed plan for remedial action at OU4 (the "OU4 Proposed Plan") was published in a major local newspaper of general circulation. MDEQ provided an opportunity for written and oral comments from the public on the OU4 Proposed Plan. A copy of the transcript of the public meeting has been made available to the public as part of the administrative record upon which MDEQ based its selection of the response action.

F.      MDEQ's decision on the final remedial action to be implemented at OU4 was embodied in a final record of decision ("OU4 ROD") issued on September 28, 2001, with EPA's concurrence. The OU4 ROD includes a summary of responses to the comments received by MDEQ on the OU4 Proposed Plan. Notice of the selected remedy was published in accordance with Section 117(b) of CERCLA.

G.      Pursuant to this Consent Decree, Weyerhaeuser shall implement the remedy identified in the 2001 OU4 ROD.

H.      Also, pursuant to this Consent Decree, Weyerhaeuser shall perform the Remedial Investigation and Feasibility Study for the Mill ("Mill RI/FS") and shall implement the Mill remedy to be selected by EPA and set forth in the Record of Decision for the Mill ("Mill ROD").

I.      Based on the information presently available to EPA, EPA believes that the Mill RI/FS, Mill Work, and OU4 Work (as defined below) will be properly and promptly completed by Weyerhaeuser if conducted in accordance with the requirements of this Consent Decree and its appendices.

J.      Solely for the purposes of Section 113(j) of CERCLA, the remedial actions to be performed by Weyerhaeuser pursuant to this Consent Decree shall constitute response actions taken or ordered by the President.

2

K.      In accordance with the NCP and Section 121(f)(1)(F) of CERCLA, 42 U.S.C.

§ 9621(f)(1)(F), EPA notified the State of Michigan of negotiations with Weyerhaeuser regarding

the implementation of the remedial design and remedial action for OU4 and the Plainwell Mill

Property, and EPA has provided the State with an opportunity to participate in such negotiations and

be a party to this Consent Decree.

L.      In accordance with Section 122(j)(1) of CERCLA, 42 U.S.C. § 9622(j)(1), EPA

notified the United States Department of the Interior and the National Oceanic and Atmospheric

Administration of the United States Department of Commerce of negotiations with Weyerhaeuser

regarding the release of hazardous substances that may have resulted in injury to the natural

resources under federal trusteeship and encouraged the trustees to participate in the negotiation of

this Consent Decree.  This Consent Decree does not resolve any liability for natural resource

damages at the Site.

M.      Prior to this Consent Decree:

(i)  the United States and State of Michigan reached a settlement with several

potentially responsible parties known as the Plainwell Parties for, among other things, past and future

response costs incurred or to be incurred in connection with OU4 and the Mill ("Plainwell

Settlement Agreement");

(ii) the Plainwell Settlement Agreement was lodged with the U.S. Bankruptcy Court

for the District of Delaware on November 3, 2003, and subsequently withdrawn to the U.S. District

Court under the caption *Weyerhaeuser Company v. Plainwell Inc., et al.,* Civil Action No. 03-CV-

1079; and

(iii) in comments submitted to the United States Department of Justice, Weyerhaeuser

objected to, among other things, the manner in which proceeds from the Plainwell Settlement

3

Agreement would be used at the Site.

N.     Through this Consent Decree, the Parties resolve Weyerhaeuser's claims, objections, and contentions regarding the Plainwell Settlement Agreement.

O.     Also, through this Consent Decree, the Parties resolve the United States' claims against Weyerhaeuser for liability at OU4 and the Mill as set forth in the United States' Complaint, but not for liability at any other area or operable unit at the Site.

P.     Weyerhaeuser does not admit any liability to the United States or any other party arising out of the transactions or occurrences alleged in the Complaint and/or in this Consent Decree, nor does it acknowledge that the release or threatened release of hazardous substances at or from the Site, including the Mill and OU4, constitutes an imminent or substantial endangerment to the public health or welfare or the environment.

Q.     The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and implementation of this Consent Decree will expedite the cleanup of the Site and will avoid prolonged and complicated litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II. JURISDICTION

1.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. §§ 9606, 9607, and 9613(b).  This Court also has personal jurisdiction over Weyerhaeuser.  Solely for the purposes of this Consent Decree and the underlying Complaint, Weyerhaeuser waives all objections and defenses that it may have to jurisdiction of the Court or to venue in this District.  Weyerhaeuser shall not challenge the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.

4

### III. PARTIES BOUND

2. This Consent Decree applies to and is binding upon the United States and upon Weyerhaeuser and its successors and assigns.  Any change in ownership or corporate status of Weyerhaeuser including, but not limited to, any transfer of assets or real or personal property, shall in no way alter Weyerhaeuser's responsibilities under this Consent Decree.

3. Weyerhaeuser shall provide a copy of this Consent Decree to each contractor hired to perform the Mill RI/FS, Mill Work, and OU4 Work (as defined below) required by this Consent Decree and shall condition all contracts entered into hereunder upon performance of the Mill RI/FS, Mill Work, and OU4 Work in conformity with the terms of this Consent Decree.  Weyerhaeuser or its contractors shall provide written notice of the Consent Decree to all subcontractors hired to perform any portion of the Mill RI/FS, Mill Work, and OU4 Work required by this Consent Decree. Weyerhaeuser shall nonetheless be responsible for ensuring that its contractors and subcontractors perform the Mill RI/FS, Mill Work, and OU4 Work contemplated herein in accordance with this Consent Decree.  With regard to the activities undertaken pursuant to this Consent Decree, each contractor and subcontractor shall be deemed to be in a contractual relationship with Weyerhaeuser within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

### IV. DEFINITIONS

4. Unless otherwise expressly provided herein, terms used in this Consent Decree which are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations.  Whenever terms listed below are used in this Consent Decree or in the appendices attached hereto and incorporated hereunder, the following definitions shall apply:

 "Allied Paper, Inc./Portage Creek/Kalamazoo River Special Account" shall mean that special

account that will be created within the EPA Hazardous Substance Superfund upon entry of the Plainwell Settlement Agreement.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 *et seq.*

"Consent Decree" shall mean this Decree and all appendices attached hereto (listed in Section XXXII). In the event of conflict between this Decree and any appendix, this Decree shall control.

"Day" shall mean a calendar day unless expressly stated to be a working day. "Working day" shall mean a day other than a Saturday, Sunday, or federal holiday. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next working day.

"Effective Date" shall be the effective date of this Consent Decree as provided in Section XXX.

"EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

"EPA Hazardous Substance Superfund" shall mean the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

"Interim Response Costs" shall mean all costs, including direct and indirect costs, (a) paid by the United States in connection with OU4 and the Mill between March 31, 2004 and the Effective Date, or (b) incurred prior to the Effective Date but paid after that date.

"Interest," unless stated otherwise, shall mean interest earned at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1st of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of such interest shall be the rate in effect at the time the interest accrues and shall be

subject to change on October 1st of each year.

"Kalamazoo River Operable Unit #5" or "OU5" shall mean the River Operable Unit of the Allied Paper, Inc./Portage Creek/Kalamazoo River Superfund Site ("Site").

"Kalamazoo River Special Account" or "River Special Account" shall mean the special account established by EPA and funded exclusively by Weyerhaeuser in accordance with Section VI of this Consent Decree and Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3).

"MDEQ" shall mean the Michigan Department of Environmental Quality.

"Mill" or "Mill Property" shall mean the property located at or near 200 Allegan Street in Plainwell, Michigan as described in Appendix H attached hereto.

"Mill Operation and Maintenance" or "Mill O & M" shall mean any activities required to maintain the effectiveness of the Mill Remedial Action as required under the Mill ROD, the Mill Operation and Maintenance Plan and the Mill Statement of Work to be approved or developed by EPA pursuant to this Consent Decree. Mill O & M shall not include any operation and maintenance of any portion of the Mill Property, if any, located between the top of the banks of the Kalamazoo River and the middle of the Kalamazoo River stream bed. Any operation and maintenance of such river banks and adjacent stream bed sediments will be addressed as part of the remedial action to be developed by EPA for the Kalamazoo River Operable Unit.

"Mill Performance Standards" shall mean the cleanup standards and other measures of achievement of the goals of the Mill Remedial Action to be set forth in the Mill ROD and the Mill SOW, including alternative standards, if any, established in the Mill ROD through application of a technical impracticability waiver.

"Mill Record of Decision" or "Mill ROD" shall mean the Record of Decision to be issued by EPA for the Mill remedy after completion of the Remedial Investigation and Feasibility Study.

"Mill Remedial Action" shall mean those activities, except for Mill Operation and Maintenance, to be undertaken by Weyerhaeuser to implement the Mill ROD, in accordance with the Mill SOW, the final Mill Remedial Design and Mill Remedial Action Work Plan, and other plans to be approved by EPA. For purposes of this Consent Decree only, the Mill Remedial Action shall not include any portion of the Mill Property, if any, located between the top of the banks of the Kalamazoo River and the middle of the Kalamazoo River stream bed. Such river banks and any adjacent river sediments will be addressed as part of the remedial action to be developed by EPA for the Kalamazoo River Operable Unit.

"Mill Remedial Action Work Plan" shall mean the document(s) to be developed pursuant to Paragraph 21 of this Consent Decree and to be approved by EPA, and any amendments thereto.

"Mill Remedial Design" shall mean those activities to be undertaken by Weyerhaeuser to develop the final plans and specifications for the Mill Remedial Action pursuant to the Mill Remedial Design Work Plan.

"Mill Remedial Design Work Plan" or "Mill RD Work Plan" shall mean the document to be developed pursuant to Paragraph 20 of this Consent Decree and to be approved by EPA, and any amendments thereto.

"Mill Remedial Investigation and Feasibility Study" or "Mill RI/FS" shall mean those activities to be undertaken by Weyerhaeuser to assess the nature and extent of contamination at the Mill and to evaluate the feasibility of potential remedial alternatives for mitigating any hazards or risks to public health, welfare, or the environment posed by such contamination, pursuant to Section VII of this Consent Decree and the Mill RI/FS SOW to be developed by EPA.

"Mill Remedial Investigation and Feasibility Study Statement of Work" or "Mill RI/FS SOW" shall mean the statement of work to be developed by EPA in accordance with CERCLA, the

NCP, and any applicable EPA guidance, for the implementation of the Mill RI/FS under this Consent Decree.

"Mill Statement of Work" or "Mill SOW" shall mean the statement of work to be developed by EPA for the implementation of the Remedial Design, Remedial Action, and Operation and Maintenance at the Mill.

"Mill Supervising Contractor" shall mean the principal contractor retained by Weyerhaeuser to supervise and direct the implementation of the Mill Work under this Consent Decree.

"Mill Work" shall mean all activities, relating to the Mill remedy, that Weyerhaeuser is required to perform under this Consent Decree, except those required by Section XXVIII (Retention of Records).

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Operable Unit 4" or "OU4" shall mean the 12th Street Landfill Operable Unit 4 of the Allied Paper, Inc./Portage Creek/Kalamazoo River Superfund Site, as described in the OU4 ROD and in Appendix A and generally shown on the map attached hereto as Appendix B.

"Operable Unit 4/Plainwell Mill Property Disbursement Special Account" or "Disbursement Special Account" shall mean the disbursement special account established by EPA in accordance with Section VI of this Consent Decree and Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3).

"OU4 Operation and Maintenance" or "OU4 O & M" shall mean all activities required to maintain the effectiveness of the OU4 Remedial Action as required under the OU4 Operation and Maintenance Plan approved or developed by EPA pursuant to this Consent Decree and the OU4 Statement of Work.

9

"OU4 Performance Standards" shall mean the cleanup standards and other measures of achievement of the goals of the OU4 Remedial Action set forth in the OU4 ROD and OU4 SOW.

"OU4 Record of Decision" or "OU4 ROD" shall mean the Record of Decision for the 12th Street Landfill OU4 of the Site, signed on September 28, 2001 by the Director of MDEQ, and all attachments thereto. The OU4 ROD and the Declaration to the OU4 ROD are attached hereto as Appendix C.

"OU4 Remedial Action" shall mean those activities, except for OU4 Operation and Maintenance, to be undertaken by Weyerhaeuser to implement the OU4 ROD, in accordance with the OU4 SOW, the final OU4 Remedial Design and OU4 Remedial Action Work Plan and other plans approved by EPA.

"OU4 Remedial Action Work Plan" shall mean the document(s) developed pursuant to Paragraph 29 of this Consent Decree and approved by EPA, and any amendments thereto.

"OU4 Remedial Design" shall mean those activities to be undertaken by Weyerhaeuser to develop the final plans and specifications for the OU4 Remedial Action pursuant to the OU4 Remedial Design Work Plan.

"OU4 Remedial Design Work Plan" or "OU4 RD Work Plan" shall mean the document developed pursuant to Paragraph 28 of this Consent Decree and approved by EPA, and any amendments thereto.

"OU4 Statement of Work" or "OU4 SOW" shall mean the statement of work for implementation of the Remedial Design, Remedial Action, and Operation and Maintenance at OU4, as set forth in Appendix E to this Consent Decree, and any modifications made in accordance with this Consent Decree.

"OU4 Supervising Contractor" shall mean the principal contractor retained by Weyerhaeuser

10

to supervise and direct the implementation of the OU4 Work under this Consent Decree.

"OU4 Work" shall mean all activities relating to the OU4 remedy that Weyerhaeuser is required to perform under this Consent Decree, excluding those activities Weyerhaeuser is required to perform under Section XXVIII (Retention of Records).

"Paragraph" shall mean a portion of this Consent Decree identified by an arabic numeral or an upper case letter.

"Parties" shall mean the United States and Weyerhaeuser Company.

"Past Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs that the United States paid at or in connection with OU4 and the Mill between October 1, 1980, and March 31, 2004 plus Interest on all such costs which has accrued pursuant to 42 U.S.C. § 9607(a) through September 30, 2004.

Plaintiff" shall mean the United States.

"Plainwell Settlement Agreement" shall mean solely that agreement entered into by the United States, the State of Michigan, Colonial Heights Packaging Inc., Philip Morris USA Inc, Chesapeake Corporation, Simpson Paper Company, Plainwell Holding Company and Plainwell Inc., lodged with the U.S. Bankruptcy Court for the District of Delaware on November 3, 2003, and subsequently withdrawn to the U.S. District Court under the caption *Weyerhaeuser Company v. Plainwell Inc., et al.,* Civil Action No. 03-CV-1079.

"Proposed Plan" shall mean the proposed plan for the Mill remedy.

"RCRA" shall mean the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901 *et seq.* (also known as the Resource Conservation and Recovery Act).

"Remedial Action" shall mean the OU4 Remedial Action and the Mill Remedial Action, collectively.

"Remedial Design" shall mean the OU4 Remedial Design and the Mill Remedial Design, collectively.

"River Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs incurred or to be incurred by EPA at or in connection with the Kalamazoo River Operable Unit.

"Section" shall mean a portion of this Consent Decree identified by a Roman numeral.

"Site" shall mean the Allied Paper, Inc./Portage Creek/Kalamazoo River Superfund Site, located in Allegan and Kalamazoo Counties, Michigan, and depicted generally on the map attached hereto as Appendix D.

"Specified Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs that the United States incurs in reviewing or developing plans, reports and other items pursuant to this Consent Decree, verifying the Mill RI/FS, Mill Work and OU4 Work, or otherwise implementing, overseeing, or enforcing this Consent Decree, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, the costs incurred pursuant to Paragraphs 15 (Disputes Concerning the Mill RI/FS), 26 (Mill Remedy Review), 34 (OU4 Remedy Review), and 107 (Work Takeover); and Sections XI (Access and Institutional Controls) (including, but not limited to, the cost of attorney time and any monies paid to secure access and/or to secure or implement institutional controls including, but not limited to, the amount of just compensation) and XVII (Emergency Response). Specified Future Response Costs shall also include all Interim Response Costs and all Interest on those Past Response Costs Weyerhaeuser has agreed to reimburse under this Consent Decree that has accrued pursuant to 42 U.S.C. § 9607(a) during the period from March 31, 2004 to the date of entry of this Consent Decree.

"State" shall mean the State of Michigan.

"Weyerhaeuser Company" or "Weyerhaeuser" shall mean Weyerhaeuser Company and its

successors and assigns.

"Work" shall mean the Mill RI/FS, the OU4 Work, and the Mill Work, collectively.

"United States" shall mean the United States of America, and its departments, agencies and instrumentalities, including EPA.

"Waste Material" shall mean (i) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (ii) any pollutant or contaminant under Section 101(33), 42 U.S.C. § 9601(33); (iii) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27); and (iv) any "hazardous substance" under Part 201 of NREPA, MCL § 324.20101.

## V. GENERAL PROVISIONS

5.      Objectives of the Parties. The objectives of the Parties in entering into this Consent Decree are: (i) for Weyerhaeuser to design and implement certain response actions at OU4 and the Mill; (ii) for EPA to create and fund the Disbursement Special Account with $6.2 million of the proceeds from the Plainwell Settlement Agreement and to reimburse up to $6.2 million of the funds in the Disbursement Special Account to Weyerhaeuser for certain response costs at the Mill and OU4 in accordance with the terms of Appendix G; (iii) for Weyerhaeuser to pay to EPA $6.2 million plus interest which EPA shall direct to the Kalamazoo River Special Account and use solely to pay or reimburse response costs at or in connection with the Kalamazoo River Operable Unit; (iv) for EPA to draw first upon funds in the Kalamazoo River Special Account to conduct or finance response actions at the Kalamazoo River Operable Unit, until such time as the funds (excluding interest) are depleted; (v) for Weyerhaeuser to reimburse EPA's Past Response Costs; (vi) for Weyerhaeuser to reimburse all Specified Future Response Costs; (vii) to resolve the United States' claims against Weyerhaeuser solely for liability at OU4 and the Mill, but not at any other area or operable unit at the Site; and (viii) to resolve the objections of Weyerhaeuser to the Plainwell Settlement Agreement.

6.      Commitments by Weyerhaeuser.

        a.      Weyerhaeuser shall make payments to EPA as provided in Section XVIII of this Consent Decree.

        b.      Weyerhaeuser shall finance and perform the Mill RI/FS, as provided in Section VII of this Consent Decree.

        c.      Weyerhaeuser shall finance and perform the Mill Work in accordance with this Consent Decree, the Mill ROD, the Mill SOW, and all work plans and other plans, standards, specifications, and schedules set forth herein or developed by Weyerhaeuser and approved by EPA pursuant to this Consent Decree, as provided in Section VIII of this Consent Decree.

        d.      Weyerhaeuser shall finance and perform the OU4 Work in accordance with this Consent Decree, the OU4 ROD, the Statement of Work for OU4 ("OU4 SOW"), and all work plans and other plans, standards, specifications, and schedules set forth herein or developed by Weyerhaeuser and approved by EPA pursuant to this Consent Decree, as provided in Section IX of this Consent Decree.

        e.      As provided by Section XVIII, Weyerhaeuser shall reimburse EPA for a portion of EPA's Past Response Costs and for EPA's Specified Future Response Costs, and pay EPA $6.2 million plus Interest earned which shall be used first by EPA when paying and reimbursing response costs incurred or to be incurred by EPA at or in connection with the Kalamazoo River Operable Unit.

        f.      Weyerhaeuser shall withdraw any objections to, or claims and contentions related to, the Plainwell Settlement Agreement, as provided by Paragraph 110 of Section XXV (Covenants by Weyerhaeuser).

7.      Weyerhaeuser shall not be required to begin the Mill RI/FS, Mill Work, and OU4

14

Work until EPA creates and funds the Disbursement Special Account, and creates the River Special Account, as provided in Section VI (Establishment and Use of Certain Site-Specific Accounts) of this Consent Decree. Subject to paragraph 10 of this Consent Decree, if EPA fails to create and fund the Disbursement Special Account, or create the River Special Account, or both, Weyerhaeuser may apply to this Court for appropriate relief.

8. <u>Compliance with Applicable Law</u>. All activities undertaken by Weyerhaeuser pursuant to this Consent Decree shall be performed in accordance with the requirements of all applicable federal and State laws and regulations. Weyerhaeuser must also comply with all applicable or relevant and appropriate requirements of all federal and State environmental laws as set forth in the Mill ROD, the OU4 ROD, the Mill SOW and the OU4 SOW. The activities conducted pursuant to this Consent Decree, if approved by EPA, shall be considered to be consistent with the NCP.

9. <u>Permits</u>

a. As provided in Section 121(e) of CERCLA and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Mill RI/FS, Mill Work, and OU4 Work conducted entirely on-Site (*i.e.*, within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Mill RI/FS, Mill Work, and OU4 Work that is not on-Site requires a federal or state permit or approval, Weyerhaeuser shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

b. Weyerhaeuser may seek relief under the provisions of Section XXI (Force Majeure) of this Consent Decree for any delay in the performance of the Mill RI/FS, Mill Work, or OU4 Work resulting from a failure to obtain, or a delay in obtaining, any permit required for the Mill

RI/FS, Mill Work, or OU4 Work.

   c.  This Consent Decree is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

## VI. ESTABLISHMENT AND USE OF CERTAIN SITE-SPECIFIC ACCOUNTS

  10. Generally. As provided by this Section and Appendix G, two separate Site-Specific accounts - to be known as the Kalamazoo River Special Account (the "River Special Account") and Operable Unit #4/Plainwell Mill Property Disbursement Special Account (the "Disbursement Special Account") - shall be established and used to provide sources of funds for payment and reimbursement of certain Site-related response costs, as specified in Paragraphs 11 - 13 of this Consent Decree. EPA's obligation to establish the River Special Account and Disbursement Special Account is contingent upon the creation and funding of the Allied Paper, Inc./Portage Creek/Kalamazoo River Special Account pursuant to the terms and conditions of the Plainwell Settlement Agreement, and payment of funds by Weyerhaeuser to EPA pursuant to Paragraph 69 of Section XVIII (Payments by Weyerhaeuser).

  11. Establishment and Management of the Disbursement Special Account. Subject to the provisions of Paragraph 10, once the Allied Paper, Inc./Portage Creek/Kalamazoo River Special Account is fully funded and EPA is prepared to create and fund the Disbursement Special Account, EPA shall provide written notice to Weyerhaeuser. Within ten days of receipt of such notice, Weyerhaeuser shall, pursuant to Paragraph 69, make initial payments to EPA totaling $6,338,851.53 million plus interest. Upon receipt of such payments from Weyerhaeuser, EPA shall immediately establish the Disbursement Special Account as a new special account within the EPA Hazardous Substance Superfund. Subject to the terms and conditions set forth in this Consent Decree, EPA shall transfer $6.2 million from the Allied Paper, Inc./Portage Creek/Kalamazoo River Special

Account to the Disbursement Special Account. EPA shall use up to $6.2 million of these funds, excluding interest earned, to reimburse Weyerhaeuser for certain Allowable Costs at OU4 and the Mill, as defined in Paragraph 12. EPA shall disburse funds in the Disbursement Special Account to Weyerhaeuser in accordance with the procedures and milestones for phased disbursements set forth in Appendix G to this Consent Decree, which is incorporated herein by reference.

12. The OU4 and Mill response costs that will be reimbursed from the Disbursement Special Account shall include certain costs incurred by Weyerhaeuser that are defined herein as "Allowable Costs." The term "Allowable Costs" is defined as response costs incurred and paid by Weyerhaeuser while performing the Mill RI/FS, Mill Work, and OU4 Work, excluding the following:

    a. any payments made by Weyerhaeuser to EPA pursuant to this Consent Decree, including, but not limited to: (i) any direct payments to EPA under Section XVIII (Payments by Weyerhaeuser); and (ii) any interest or stipulated penalties paid pursuant to Section XXIII (Stipulated Penalties);

    b. attorneys' fees and costs, except reasonable attorneys' fees and costs for obtaining access or institutional controls as required by Section XI;

    c. costs of any response activities Weyerhaeuser performs that are not required under, or approved by EPA pursuant to, this Consent Decree;

    d. costs related to Weyerhaeuser's litigation, settlement, or development of potential contribution claims or identification of defendants, including costs relating to the negotiation or entry of this Consent Decree;

    e. internal costs of Weyerhaeuser, including but not limited to, salaries, travel, or in-kind services;

f.    any costs incurred by Weyerhaeuser prior to the Effective Date; or

g.    any costs incurred by Weyerhaeuser pursuant to Section XXII (Dispute Resolution).

13.    <u>Establishment of the River Special Account</u>.  Within 30 days of EPA's receipt of payment from Weyerhaeuser pursuant to Paragraph 69.a of Section XVIII (Payments by Weyerhaeuser), EPA shall establish the River Special Account as a new special account within the EPA Hazardous Substance Superfund.  The River Special Account shall be funded by EPA in accordance with Paragraph 69.c of Section XVIII (Payments by Weyerhaeuser).  Subject to the terms and conditions set forth in this Consent Decree, EPA agrees to use the funds in the River Special Account, as specified in Paragraph 69.c of Section XVIII (Payments by Weyerhaeuser).

## VII.  PERFORMANCE OF MILL REMEDIAL INVESTIGATION AND FEASIBILITY STUDY

14.    <u>Performance of the Mill RI/FS</u>.  Weyerhaeuser shall finance and perform the Mill Remedial Investigation and Feasibility Study ("Mill RI/FS") in accordance with the Mill RI/FS SOW.  Weyerhaeuser shall identify and propose Performance Standards for the Mill ("Mill Performance Standards"), including all "applicable or relevant and appropriate requirements" as required by Section 121(d) of CERCLA, 42 U.S.C. § 9621(d), and 40 C.F.R. § 300.400(g), and in accordance with the requirements and schedule established in or pursuant to the Mill RI/FS Statement of Work.  Pursuant to the Mill RI/FS Statement of Work, Weyerhaeuser shall determine the nature and extent of contamination at the Mill to support the development and evaluation of remedial alternatives, shall evaluate risk to human health and the environment from the contamination, and shall develop and evaluate the feasibility of potential remedial alternatives for mitigating any hazards or risks to public health, welfare, or the environment posed by such

18

contamination.

15. <u>Disputes Concerning the Mill RI/FS</u>

a. Except as provided in Section XXI (Force Majeure), and Section XXIII (Stipulated Penalties), and except for disputes arising under Section XI (Access and Institutional Controls), the provisions of this Paragraph shall be the sole mechanism for the resolution of disputes concerning the Mill RI/FS. Any dispute subject to the provisions of this Paragraph shall not be subject to judicial review or to the provisions of Section XXII (Dispute Resolution). Weyerhaeuser shall attempt to resolve any dispute concerning the Mill RI/FS through informal negotiations with EPA during a period not to exceed 14 days, commencing 7 days from the time Weyerhaeuser sends written notice of the dispute to EPA. If requested by Weyerhaeuser during informal negotiations, representatives of EPA shall meet with representatives of Weyerhaeuser in an effort to resolve the dispute.

b. In the event that informal negotiations do not resolve the dispute, then within 14 days after the conclusion of the informal negotiation period Weyerhaeuser shall serve on EPA, with a copy to MDEQ, a written Statement of Position on the matter, including, but not limited to, any factual data, analysis or opinion supporting that position and any supporting documentation relied upon by Weyerhaeuser, and concurrently EPA shall serve on Weyerhaeuser, with a copy to MDEQ, its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by EPA. Within 10 days after EPA's service of its position on Weyerhaeuser, the Director of Region 5 Superfund Division shall make a final decision with regard to the dispute and shall notify Weyerhaeuser of that decision in writing, with a copy to MDEQ.

## VIII. PERFORMANCE OF THE MILL WORK

A.  Selection of the Mill Remedy

16.     As provided in Section 121 of CERCLA, 42 U.S.C. § 9621, and the NCP, and in a manner consistent with Section 117 of CERCLA, 42 U.S.C. § 9617, EPA shall select the remedy for the Mill and shall issue a Mill ROD setting forth the selected remedy.

a.     Proposed Plan for the Mill.  Consistent with Section 117(a) of CERCLA, 42 U.S.C. § 9617(a), prior to issuing the Mill ROD, EPA shall issue a proposed plan for the Mill remedy ("Proposed Plan").

b.     EPA shall provide a copy of the Proposed Plan to Weyerhaeuser and shall submit the Proposed Plan for public comment in accordance with Section 117(a) of CERCLA, 42 U.S.C. § 9617(a).  The dispute resolution provisions of this Consent Decree are not applicable to the Proposed Plan or the Mill ROD.   However, Weyerhaeuser may comment on the Proposed Plan as provided in Section 300.430(f)(3)(C) and (D) of the NCP.

17.     After issuance of the Mill ROD, EPA shall issue to Weyerhaeuser a draft Mill SOW, with a copy to MDEQ.  Weyerhaeuser may provide EPA, with a copy to MDEQ, with comments on the draft Mill SOW within 45 days after receipt of the draft SOW.  EPA shall consider any comments received and, after a reasonable opportunity for review and comment by MDEQ, shall issue to Weyerhaeuser a final Mill SOW, which shall be incorporated into and shall become enforceable as a part of this Consent Decree. Before issuance of the final Mill SOW, EPA shall meet with Weyerhaeuser with regard to all significant comments raised by Weyerhaeuser on the SOW.

B.  Performance of Mill Work

18.     Weyerhaeuser shall perform the Mill Work as set forth in this Section VIII.

19.     Selection of Mill Supervising Contractor

a.      All components of the Mill Work to be performed by Weyerhaeuser pursuant to this Section and Sections X (Quality Assurance, Sampling and Data Analysis) and XVII (Emergency Response) of this Consent Decree shall be under the direction and supervision of the Mill Supervising Contractor, the selection of which shall be subject to disapproval by EPA. Within 10 days of the issuance of the final Mill SOW, Weyerhaeuser shall notify EPA in writing of the name, title, and qualifications of any contractor proposed to be the Mill Supervising Contractor. With respect to any contractor proposed to be Mill Supervising Contractor, Weyerhaeuser shall demonstrate that the proposed contractor has a quality system that complies with ANSI/ASQC E4-1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs," (American National Standard, January 5, 1995), by submitting a copy of the proposed contractor's Quality Management Plan (QMP). The QMP should be prepared in accordance with "EPA Requirements for Quality Management Plans (QA/R-2)" (EPA/240/B-01/002, March 2001) or equivalent documentation as determined by EPA. EPA will issue a notice of disapproval or an authorization to proceed. If at any time thereafter, Weyerhaeuser proposes to change a Mill Supervising Contractor, Weyerhaeuser shall give such notice to EPA and must obtain an authorization to proceed from EPA before the new Mill Supervising Contractor performs, directs, or supervises any Mill Work under this Consent Decree.

b.      If EPA disapproves a proposed Mill Supervising Contractor, EPA will notify Weyerhaeuser in writing. Weyerhaeuser shall submit to EPA a list of contractors, including the qualifications of each contractor, that would be acceptable to Weyerhaeuser within 30 days of receipt of EPA's disapproval of the contractor previously proposed. EPA will provide written notice of the names of any contractor(s) that it disapproves and an authorization to proceed with respect to any of the other contractors. Weyerhaeuser may select any contractor from that list that is not

21

disapproved and shall notify EPA of the name of the contractor selected within 21 days of EPA's authorization to proceed.

       c.      If EPA fails to provide written notice of its authorization to proceed or disapproval as provided in this Paragraph and this failure prevents Weyerhaeuser from meeting one or more deadlines in a plan approved by the EPA pursuant to this Consent Decree, Weyerhaeuser may seek relief under the provisions of Section XXI (Force Majeure).

      20.    <u>Mill Remedial Design</u>

       a.      Within 60 days after EPA's issuance of an authorization to proceed pursuant to Paragraph 19, Weyerhaeuser shall submit to EPA a work plan for the design of the Remedial Action at the Mill ("Mill Remedial Design Work Plan" or "Mill RD Work Plan"). The Mill RD Work Plan shall provide for design of the remedy set forth in the ROD, in accordance with the Mill SOW and for achievement of the Mill Performance Standards and other requirements set forth in the Mill ROD and Mill SOW and/or this Consent Decree. Upon its approval by EPA, the Mill Remedial Design Work Plan shall be incorporated into and become enforceable under this Consent Decree. Within 30 days after EPA's issuance of an authorization to proceed, Weyerhaeuser shall submit to EPA an amendment to the RI/FS Health and Safety Plan that addresses field design activities and which conforms to the applicable Occupational Safety and Health Administration and EPA requirements including, but not limited to, 29 C.F.R. § 1910.120. The Health and Safety Plan amendment shall comprise part of the Mill RD Work Plan.

       b.      Unless otherwise required by EPA, the Mill Remedial Design Work Plan shall include plans and schedules for implementation of all remedial design and pre-design tasks identified in the Mill SOW, including, but not limited to, plans and schedules for the completion of: the pre-design Quality Assurance Project Plan, Health and Safety Plan, the Construction Quality Assurance

<div align="center">22</div>

Plan and a pre-design Field Sampling Plan. In addition, the Mill RD Work Plan shall include a schedule for completion of the Mill Remedial Action Work Plan. If, pursuant to Section XIII (Approval of Plans and Other Submissions), EPA notifies Weyerhaeuser of its disapproval of the RD Work Plan, Weyerhaeuser shall submit revisions to the RD Work Plan within 30 days of the date of the notice of disapproval or within a longer period of time if specified by EPA in such notice.

c.      Upon approval of the Mill RD Work Plan by EPA, after a reasonable opportunity for review and comment by MDEQ, and submittal of the Health and Safety Plan for all pre-design field activities to EPA, Weyerhaeuser shall implement the Mill RD Work Plan. Weyerhaeuser shall submit to EPA all plans, submittals and other deliverables required under the approved Mill RD Work Plan in accordance with the approved schedule for review and approval pursuant to Section XIII (Approval of Plans and Other Submissions). Unless otherwise directed or approved by EPA, Weyerhaeuser shall not commence further remedial design activities at the Mill prior to approval of the Mill RD Work Plan.

d.      If the Mill RD Work Plan requires an EPA-approved preliminary design, the preliminary design submittal shall include, at a minimum, the following: (1) design criteria; (2) results of additional field sampling and pre-design work; (3) project delivery strategy; (4) preliminary plans, drawings and sketches; (5) required specifications in outline form; and (6) a preliminary construction schedule.

e.      The intermediate design submittal, if required by EPA, or if independently submitted by Weyerhaeuser, shall be a continuation and expansion of the preliminary design. Any value engineering proposals must be identified and evaluated by Weyerhaeuser during this review.

f.      Unless otherwise directed by EPA, in the approved Mill RD Work Plan, the final design submittal shall include, at a minimum, the following: (1) final plans and specifications;

23

(2) Operation and Maintenance Plan; (3) Construction Quality Assurance Project Plan ("CQAPP"); (4) Contingency Plan; and (5) Performance Standards Verification Plan ("PSVP"). The CQAPP, which shall detail the approach to quality assurance during construction activities at the Mill, shall specify a quality assurance official ("QA Official"), to conduct a quality assurance program during the construction phase of the project. The PSVP shall explain in detail which mechanisms will ensure that the RA achieves the overall Remedial Action Objectives ("RAOs") developed and defined in the ROD, including those RAOs that are not based on concentration levels of hazardous substances. The PSVP shall include confirmation sampling.

21.    <u>Mill Remedial Action</u>

a.    Within 45 days after the approval of the final design submittal, Weyerhaeuser shall submit to EPA a work plan for the performance of the Remedial Action at the Mill ("Mill Remedial Action Work Plan"). The Mill Remedial Action Work Plan shall provide for construction and implementation of the remedy set forth in the Mill ROD and achievement of the Mill Performance Standards, in accordance with this Consent Decree, the Mill ROD and Mill SOW, and the design plans and specifications developed in accordance with the Mill RD Work Plan and approved by EPA. Upon its approval by EPA, the Mill Remedial Action Work Plan shall be incorporated into and become enforceable under this Consent Decree. At the same time as it submits the Mill Remedial Action Work Plan, Weyerhaeuser shall submit to EPA a Health and Safety Plan for field activities required by the Mill Remedial Action Work Plan which conforms to the applicable Occupational Safety and Health Administration and EPA requirements including, but not limited to, 29 C.F.R. § 1910.120.

b.    The Mill Remedial Action Work Plan shall include all requirements specified in the Mill SOW and, unless otherwise directed by EPA, in the approved RD Work Plan, and shall

24

include the following deliverables: (1) the schedule for completion of the Mill Remedial Action; (2) the schedule for developing and submitting other required Mill Remedial Action plans; (3) methodology for implementation of the CQAPP; (4) the PSVP; (5) methods for satisfying permitting requirements; (6) preliminary methodology for implementation of the Operation and Maintenance Plan; (7) methodology for implementation of the Contingency Plan; (8) a Construction Quality Assurance Plan; and (9) procedures and plans for the decontamination of equipment and the disposal of contaminated materials. The Mill Remedial Action Work Plan also shall include a schedule for implementation of all Mill Remedial Action tasks identified in the final design submittal, and shall identify the initial formulation of Weyerhaeuser's Mill Remedial Action project team (including, but not limited to, the Mill Supervising Contractor). If, pursuant to Section XIII (Approval of Plans and Other Submissions), EPA notifies Weyerhaeuser of its disapproval of the RA Work Plan, Weyerhaeuser shall submit revisions to the RA Work Plan within 30 days of the date of the notice of disapproval or within a longer period of time if specified by EPA in such notice.

c. Upon approval of the Mill Remedial Action Work Plan by EPA, after a reasonable opportunity for review and comment by MDEQ, Weyerhaeuser shall implement the activities required under the Mill Remedial Action Work Plan. Weyerhaeuser shall submit to EPA all plans, submittals, or other deliverables required under the approved Mill Remedial Action Work Plan in accordance with the approved schedule for review and approval pursuant to Section XIII (Approval of Plans and Other Submissions). Unless otherwise directed or approved by EPA, Weyerhaeuser shall not commence physical Mill Remedial Action activities at the Site prior to approval of the Mill Remedial Action Work Plan.

22. Duration of the Mill Remedial Action and Mill Operation and Maintenance. Weyerhaeuser shall continue to implement the Mill Remedial Action and Mill O & M until the Mill

Performance Standards are achieved and for so long thereafter as is otherwise required under this Consent Decree.

23. Modification of the Mill SOW and Related Work Plans

a. If EPA determines that modification to the work specified in the Mill SOW and/or in work plans developed pursuant to the Mill SOW is necessary to achieve and maintain the Mill Performance Standards or to carry out and maintain the effectiveness of the remedy set forth in the Mill ROD, EPA may require that such modification be incorporated in the Mill SOW and/or such work plans, provided, however, that a modification may only be required pursuant to this Paragraph to the extent that it is consistent with the scope of the remedy selected in the Mill ROD.

b. If Weyerhaeuser objects to any modification determined by EPA to be necessary pursuant to this Paragraph, it may seek dispute resolution pursuant to Paragraph 84 (Record Review) of Section XXII (Dispute Resolution). The Mill SOW and/or related work plans shall be modified in accordance with final resolution of the dispute.

c. Weyerhaeuser shall implement any work required by any modifications incorporated in the Mill SOW and/or in work plans developed pursuant to the Mill SOW in accordance with this Paragraph.

d. Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions as otherwise provided in this Consent Decree.

24. Weyerhaeuser acknowledges and agrees that nothing in this Consent Decree, the Mill SOW, or Mill Remedial Design or Mill Remedial Action Work Plan constitutes a warranty or representation of any kind by the United States that compliance with the work requirements set forth in the Mill SOW and the work plans will achieve the Mill Performance Standards.

25. Weyerhaeuser shall, prior to any off-Site shipment of Waste Material from the Site

26

to an out-of-state waste management facility, provide written notification to the appropriate state environmental official in the receiving facility's state and to the EPA Project Coordinator of such shipment of Waste Material. However, this notification requirement shall not apply to any off-Site shipments when the total volume of all such shipments will not exceed 10 cubic yards.

        a.      Weyerhaeuser shall include in the written notification the following information, where available: (1) the name and location of the facility to which the Waste Material is to be shipped; (2) the type and quantity of the Waste Material to be shipped; (3) the expected schedule for the shipment of the Waste Material; and (4) the method of transportation. Weyerhaeuser shall notify the state in which the planned receiving facility is located of major changes in the shipment plan, such as a decision to ship the Waste Material to another facility within the same state, or to a facility in another state.

        b.      The identity of the receiving facility and state will be determined by Weyerhaeuser following the award of the contract for Mill Remedial Action construction. Weyerhaeuser shall provide the information required by this Paragraph as soon as practicable after the award of the contract and before the Waste Material is actually shipped.

        26.    <u>Mill Remedy Review</u>

        a.      <u>Periodic Review</u>. If after the completion of all remedial actions at the Mill (excluding Mill O&M), any Waste Material remains at the Mill above levels that would allow for unlimited use and unrestricted exposure, Weyerhaeuser shall conduct and finance any studies and investigations as requested by EPA, in order to permit EPA to conduct reviews of whether the Mill Remedial Action is protective of human health and the environment. Weyerhaeuser shall conduct such studies no less than every five years unless required otherwise by Section 121(c) of CERCLA and any applicable regulations.

<div align="center">27</div>

b.     EPA Selection of Further Response Actions.  In accordance with CERCLA, if EPA determines, at any time, that the Mill Remedial Action is not protective of human health and the environment, EPA may select further response actions for the Mill in accordance with the requirements of CERCLA and the NCP.

c.     Opportunity to Comment.     Weyerhaeuser and, if required by Sections 113(k)(2), 117, or 121(f) of CERCLA, MDEQ, and the public, will be provided with an opportunity to comment on any further response actions proposed by EPA as a result of the review of the Mill Remedial Action conducted pursuant to Section 121(c) of CERCLA and to submit written comments for the record during the comment period.

d.     Weyerhaeuser's Obligation to Perform Further Mill Actions.  If EPA selects further response actions for the Mill, Weyerhaeuser shall perform such further response actions, to the extent that the reopener conditions of Paragraphs 102 and 103 (United States' reservations of rights, based on unknown conditions or new information) are satisfied.  Upon selection of any such further Mill response actions (after the opportunity to comment described in Paragraph 26.c), EPA shall so notify Weyerhaeuser (with a copy to MDEQ) and shall provide Weyerhaeuser with a reasonable opportunity to perform such response actions as part of the Mill Work pursuant to this Consent Decree.  Weyerhaeuser may invoke the procedures set forth in Section XXII (Dispute Resolution) to dispute (1) EPA's determination that the reopener conditions of Paragraphs 102 and 103 (United States' reservations of rights, based on unknown conditions or new information) are satisfied, (2) EPA's determination that the Mill Remedial Action is not protective of human health and the environment, or (3) EPA's selection of the further response actions.  Disputes pertaining to whether the Mill Remedial Action is protective or to EPA's selection of further response actions shall be resolved pursuant to Paragraph 84 (Record Review).

e.      Submissions of Plans.  If Weyerhaeuser is required to perform further response actions at the Mill pursuant to Paragraph 26.d, it shall submit a plan for such work to EPA for approval in accordance with the procedures set forth in Section VIII (Performance of Mill Work) and shall implement the plan approved by EPA in accordance with the provisions of this Decree.

## IX. PERFORMANCE OF OU4 WORK

27.      Selection of OU4 Supervising Contractor

a.      All components of the OU4 Work to be performed by Weyerhaeuser pursuant to this Section and Sections X (Quality Assurance, Sampling and Data Analysis) and XVII (Emergency Response) of this Consent Decree shall be under the direction and supervision of the OU4 Supervising Contractor, the selection of which shall be subject to disapproval by EPA.  Within 10 days after the lodging of this Consent Decree, Weyerhaeuser shall notify EPA in writing of the name, title, and qualifications of any contractor proposed to be the OU4 Supervising Contractor. With respect to any contractor proposed to be Mill Supervising Contractor, Weyerhaeuser shall demonstrate that the proposed contractor has a quality system that complies with ANSI/ASQC E4-1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs," (American National Standard, January 5, 1995), by submitting a copy of the proposed contractor's Quality Management Plan (QMP). The QMP should be prepared in accordance with "EPA Requirements for Quality Management Plans (QA/R-2)" (EPA/240/B-01/002, March 2001) or equivalent documentation as determined by EPA.  EPA will issue a notice of disapproval or an authorization to proceed.  If at any time thereafter, Weyerhaeuser proposes to change an OU4 Supervising Contractor, Weyerhaeuser shall give such notice to EPA and must obtain an authorization to proceed from EPA before the new OU4 Supervising Contractor performs, directs, or supervises any OU4 Work under this Consent Decree.

29

b.     If EPA disapproves a proposed OU4 Supervising Contractor, EPA will notify Weyerhaeuser in writing. Weyerhaeuser shall submit to EPA a list of contractors, including the qualifications of each contractor, that would be acceptable to Weyerhaeuser within 30 days of receipt of EPA's disapproval of the contractor previously proposed. EPA will provide written notice of the names of any contractor(s) that it disapproves and an authorization to proceed with respect to any of the other contractors. Weyerhaeuser may select any contractor from that list that is not disapproved and shall notify EPA of the name of the contractor selected within 21 days of EPA's authorization to proceed.

c.     If EPA fails to provide written notice of its authorization to proceed or disapproval as provided in this Paragraph and this failure prevents Weyerhaeuser from meeting one or more deadlines in a plan approved by EPA pursuant to this Consent Decree, Weyerhaeuser may seek relief under the provisions of Section XXI (Force Majeure).

28.   OU4 Remedial Design

a.     Within 60 days after EPA's issuance of an authorization to proceed pursuant to Paragraph 27, Weyerhaeuser shall submit to EPA a work plan for the design of the Remedial Action at OU4 ("OU4 Remedial Design Work Plan" or "OU4 RD Work Plan"). The OU4 Remedial Design Work Plan shall provide for design of the remedy set forth in the OU4 ROD, in accordance with the OU4 SOW and for achievement of the OU4 Performance Standards and other requirements set forth in the OU4 ROD, this Consent Decree and/or the OU4 SOW. Upon its approval by EPA, the OU4 Remedial Design Work Plan shall be incorporated into and become enforceable under this Consent Decree. Within 30 days after EPA's issuance of an authorization to proceed, Weyerhaeuser shall submit to EPA a Health and Safety Plan for pre-field design activities which conforms to the applicable Occupational Safety and Health Administration and EPA requirements including, but not

limited to, 29 C.F.R. § 1910.120. The Health and Safety Plan shall comprise part of the OU4 RD Work Plan.

b.       The OU4 Remedial Design Work Plan shall include plans and schedules for implementation of all remedial design and pre-design tasks identified in the OU4 SOW, including, but not limited to, plans and schedules for the completion of: the pre-design Quality Assurance Project Plan, Health and Safety Plan, the Construction Quality Assurance Plan and a pre-design Field Sampling Plan. In addition, the OU4 Remedial Design Work Plan shall include a schedule for completion of the OU4 Remedial Action Work Plan. If, pursuant to Section XIII (Approval of Plans and Other Submissions), EPA notifies Weyerhaeuser of its disapproval of the RD Work Plan, Weyerhaeuser shall submit revisions to the RD Work Plan within 30 days of the date of the notice of disapproval or within a longer period of time if specified by EPA in such notice.

c.       Upon approval of the OU4 Remedial Design Work Plan by EPA, after a reasonable opportunity for review and comment by MDEQ, and submittal of the Health and Safety Plan for all pre-design field activities to EPA, Weyerhaeuser shall implement the OU4 Remedial Design Work Plan. Weyerhaeuser shall submit to EPA all plans, submittals and other deliverables required under the approved OU4 Remedial Design Work Plan in accordance with the approved schedule for review and approval pursuant to Section XIII (Approval of Plans and Other Submissions). Unless otherwise directed or approved by EPA, Weyerhaeuser shall not commence further OU4 Remedial Design activities at the Site prior to approval of the OU4 Remedial Design Work Plan.

d.       If required by the approved OU4 RD Work Plan, the preliminary design submittal shall include, at a minimum, the following: (1) design criteria; (2) results of treatability studies; (3) results of additional field sampling and pre-design work; (4) project delivery strategy;

31

(5) preliminary plans, drawings and sketches; (6) required specifications in outline form; and (7) a preliminary construction schedule.

e. The intermediate design submittal, if required by EPA, or if independently submitted by Weyerhaeuser, shall be a continuation and expansion of the preliminary design. Any value engineering proposals must be identified and evaluated by Weyerhaeuser during this review.

f. Unless otherwise directed by EPA in the approved OU4 RD Work Plan, the final design submittal shall include, at a minimum, the following: (1) final plans and specifications; (2) OU4 Operation and Maintenance Plan; (3) Construction Quality Assurance Project Plan ("CQAPP"); (4) Contingency Plan; and (5) Performance Standards Verification Plan ("PSVP"). The CQAPP, which shall detail the approach to quality assurance during construction activities at OU4, shall specify a quality assurance official ("QA Official"), independent of the OU4 Supervising Contractor, to conduct a quality assurance program during the construction phase of the project. The PSVP shall explain in detail which mechanisms will ensure that the RA achieves the overall Remedial Action Objectives ("RAOs") developed and defined in the ROD, including those RAOs that are not based on concentration levels of hazardous substances. The PSVP shall include confirmation sampling.

29. OU4 Remedial Action

a. Within 30 days after the approval of the final design submittal, Weyerhaeuser shall submit to EPA a work plan for the performance of the OU4 Remedial Action ("OU4 Remedial Action Work Plan"). The OU4 Remedial Action Work Plan shall provide for construction and implementation of the remedy set forth in the OU4 ROD and achievement of the OU4 Performance Standards, in accordance with this Consent Decree, the OU4 ROD, the OU4 SOW, and the design plans and specifications developed in accordance with the OU4 Remedial Design Work Plan and

32

approved by EPA. Upon its approval by EPA, the OU4 Remedial Action Work Plan shall be incorporated into and become enforceable under this Consent Decree. At the same time as it submits the OU4 Remedial Action Work Plan, Weyerhaeuser shall submit to EPA an amendment to the existing Health and Safety Plan that addresses field activities required by the OU4 Remedial Action Work Plan and which conforms to the applicable Occupational Safety and Health Administration and EPA requirements including, but not limited to, 29 C.F.R. § 1910.120.

        b.      The OU4 Remedial Action Work Plan shall include the following: (1) a schedule for completion of the OU4 Remedial Action; (2) a schedule for developing and submitting other required OU4 Remedial Action plans; (3) a Performance Standards Verification Plan, which shall include a groundwater monitoring plan; (4) methods for satisfying permitting requirements; (5) a methodology for implementation of the OU4 Operation and Maintenance Plan; (6) a methodology for implementation of the Contingency Plan; (7) a Construction Quality Assurance Plan; and (8) procedures and plans for the decontamination of equipment and the disposal of contaminated materials. The OU4 Remedial Action Work Plan also shall include the methodology for implementation of the Construction Quality Assurance Plan and a schedule for implementation of all OU4 Remedial Action tasks identified in the final design submittal, and shall identify the initial formulation of Weyerhaeuser's OU4 Remedial Action project team (including, but not limited to, the OU4 Supervising Contractor).

        c.      Upon approval of the OU4 Remedial Action Work Plan by EPA, after a reasonable opportunity for review and comment by MDEQ, Weyerhaeuser shall implement the activities required under the OU4 Remedial Action Work Plan. Weyerhaeuser shall submit to EPA all plans, submittals, or other deliverables required under the approved OU4 Remedial Action Work Plan in accordance with the approved schedule for review and approval pursuant to Section XIII

(Approval of Plans and Other Submissions). Unless otherwise directed or approved by EPA, Weyerhaeuser shall not commence physical OU4 Remedial Action activities at the Site prior to approval of the OU4 Remedial Action Work Plan.

30. <u>Duration of the OU4 Remedial Action and OU4 Operation and Maintenance</u>. Weyerhaeuser shall continue to implement the OU4 Remedial Action and OU4 O & M until the OU4 Performance Standards are achieved and for so long thereafter as is otherwise required under this Consent Decree.

31. <u>Modification of the OU4 SOW and Related Work Plans</u>

a. If EPA determines that modification to the work specified in the OU4 SOW and/or in work plans developed pursuant to the OU4 SOW is necessary to achieve and maintain the OU4 Performance Standards or to carry out and maintain the effectiveness of the remedy set forth in the OU4 ROD, EPA may require that such modification be incorporated in the OU4 SOW and/or such work plans, provided, however, that a modification may only be required pursuant to this Paragraph to the extent that it is consistent with the scope of the remedy selected in the OU4 ROD.

b. For the purposes of this Paragraph 31 and Paragraph 65 only, the "scope of the remedy selected in the OU4 ROD" is set forth in Appendix I ("Record of Decision for the 12th Street Landfill Operable Unit dated September 28, 2001") which is incorporated herein.

c. If Weyerhaeuser objects to any modification determined by EPA to be necessary pursuant to this Paragraph, it may seek dispute resolution pursuant to Section XXII (Dispute Resolution), Paragraph 84 (Record Review). The OU4 SOW and/or related work plans shall be modified in accordance with final resolution of the dispute.

d. Weyerhaeuser shall implement any work required by any modifications incorporated in the OU4 SOW and/or in work plans developed pursuant to the OU4 SOW in

34

accordance with this Paragraph.

e.     Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions as otherwise provided in this Consent Decree.

32.     Weyerhaeuser acknowledges and agrees that nothing in this Consent Decree, the OU4 SOW, the OU4 Remedial Design, or the OU4 Remedial Action Work Plan constitutes a warranty or representation of any kind by the United States that compliance with the work requirements set forth in the OU4 SOW and the OU4 Work Plans will achieve the OU4 Performance Standards.

33.     Weyerhaeuser shall, prior to any off-Site shipment of Waste Material from the Site to an out-of-state waste management facility, provide written notification to the appropriate state environmental official in the receiving facility's state and to the EPA Project Coordinator of such shipment of Waste Material. However, this notification requirement shall not apply to any off-Site shipments when the total volume of all such shipments will not exceed 10 cubic yards.

a.     Weyerhaeuser shall include in the written notification the following information, where available: (1) the name and location of the facility to which the Waste Material is to be shipped; (2) the type and quantity of the Waste Material to be shipped; (3) the expected schedule for the shipment of the Waste Material; and (4) the method of transportation. Weyerhaeuser shall notify the state in which the planned receiving facility is located of major changes in the shipment plan, such as a decision to ship the Waste Material to another facility within the same state, or to a facility in another state.

b.     The identity of the receiving facility and state will be determined by Weyerhaeuser following the award of the contract for Remedial Action construction. Weyerhaeuser shall provide the information required by this Paragraph as soon as practicable after the award of the contract and before the Waste Material is actually shipped.

34.     OU4 Remedy Review

a.     Periodic Review. Weyerhaeuser shall conduct any studies and investigations as requested by EPA, in order to permit EPA to conduct reviews of whether the OU4 Remedial Action is protective of human health and the environment. Weyerhaeuser shall conduct such studies at least every five years as required by Section 121(c) of CERCLA and any applicable regulations.

b.     EPA Selection of Further OU4 Response Actions. In accordance with CERCLA, if EPA determines, at any time, that the OU4 Remedial Action is not protective of human health and the environment, EPA may select further response actions for OU4 in accordance with the requirements of CERCLA and the NCP.

c.     Opportunity To Comment. Weyerhaeuser and, if required by Sections 113(k)(2), 117, or 121(f) of CERCLA, MDEQ and the public, will be provided with an opportunity to comment on any further response actions proposed by EPA as a result of the review conducted pursuant to Section 121(c) of CERCLA and to submit written comments for the record during the comment period.

d.     Weyerhaeuser's Obligation To Perform Further OU4 Response Actions. If EPA selects further response actions for OU4, Weyerhaeuser shall perform such further response actions to the extent that the reopener conditions in Paragraphs 102 and 103 (United States' reservations of liability based on unknown conditions or new information) are satisfied. Upon selection of any such further remedial response actions (after the opportunity to comment described in Paragraph 34.c), and if the reopener conditions in Paragraph 102 or Paragraph 103 are satisfied, EPA shall so notify Weyerhaeuser (with a copy to MDEQ) and shall provide Weyerhaeuser with a reasonable opportunity to perform such response actions as part of the OU4 Work pursuant to this Consent Decree. Weyerhaeuser may invoke the procedures set forth in Section XXII (Dispute

36

Resolution) to dispute (1) EPA's determination that the reopener conditions of Paragraphs 102 and 103 (United States' reservations of liability based on unknown conditions or new information) are satisfied, (2) EPA's determination that the OU4 Remedial Action is not protective of human health and the environment, or (3) EPA's selection of further response actions. Disputes pertaining to whether the OU4 Remedial Action is protective or to EPA's selection of further response actions shall be resolved pursuant to Paragraph 84 (Record Review).

      e.    <u>Submissions of Plans</u>. If Weyerhaeuser is required to perform further response actions pursuant to Paragraph 34.d, it shall submit a modification to the RA Work Plan for such work to EPA for approval in accordance with the procedures set forth in Section IX (Performance of OU4 Work) and shall implement the plan approved by EPA in accordance with the provisions of this Decree.

<div align="center">X. <u>QUALITY ASSURANCE, SAMPLING, AND DATA ANALYSIS</u></div>

      35.    Weyerhaeuser shall use quality assurance, quality control, and chain of custody procedures for all treatability, design, compliance and monitoring samples in accordance with "EPA Requirements for Quality Assurance Project Plans for Environmental Data Operation," (EPA QA/R5) (EPA/240/B-01/003, March 2001); "Guidance for Quality Assurance Project Plans (QA/G5)" (EPA/600/R-98/018, February 1998), and subsequent amendments to such guidelines upon notification by EPA to Weyerhaeuser of such amendment. Amended guidelines shall apply only to procedures conducted after such notification. Prior to the commencement of any monitoring project under this Consent Decree, Weyerhaeuser shall submit to EPA for approval, after a reasonable opportunity for review and comment by MDEQ, a Quality Assurance Project Plan ("QAPP") that is consistent with the Mill SOW and the OU4 SOW, the NCP and applicable guidance documents. If relevant to the proceeding, the Parties agree that validated sampling data

<div align="center">37</div>

generated in accordance with the QAPP(s) and reviewed and approved by EPA shall be admissible as evidence, without objection, in any proceeding under this Decree. Weyerhaeuser shall ensure that EPA personnel and its authorized representatives are allowed access at reasonable times to all laboratories utilized by Weyerhaeuser in implementing this Consent Decree. In addition, Weyerhaeuser shall ensure that such laboratories shall analyze all samples submitted by EPA pursuant to the QAPP for quality assurance monitoring. Weyerhaeuser shall ensure that the laboratories it utilizes for the analysis of samples taken pursuant to this Decree perform all analyses according to accepted EPA methods. Accepted EPA methods consist of those methods which are documented in the "Contract Lab Program Statement of Work for Inorganic Analysis" and the "Contract Lab Program Statement of Work for Organic Analysis," dated February 1988, and any amendments made thereto during the course of the implementation of this Decree; however, upon approval by EPA, after opportunity for review and comment by MDEQ, Weyerhaeuser may use other analytical methods which are as stringent as or more stringent than the CLP-approved methods. Weyerhaeuser shall ensure that all laboratories it uses for analysis of samples taken pursuant to this Consent Decree participate in an EPA or EPA-equivalent QA/QC program. Weyerhaeuser shall use laboratories that have a documented Quality System which complies with ANSI/ASQC E4-1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs," (American National Standard, January 5, 1995), and "EPA Requirements for Quality Management Plans (QA/R-2)," (EPA/240/B-1, March 2001) or equivalent documentation as determined by EPA, EPA may consider laboratories accredited under the National Environmental Laboratory Accreditation Program(NELAP) as meeting the Quality System requirements. Weyerhaeuser shall ensure that all field methodologies utilized in collecting samples for subsequent analysis pursuant to this Consent Decree will be conducted in accordance with the

procedures set forth in the QAPP approved by EPA.

36. Upon request, Weyerhaeuser shall allow split or duplicate samples to be taken by EPA or its authorized representatives. Weyerhaeuser shall notify EPA not less than 21 days in advance of any sample collection activity unless shorter notice is agreed to by EPA. In addition, EPA shall have the right to take any additional samples that EPA deems necessary. Upon request, EPA shall allow Weyerhaeuser to take split or duplicate samples of any samples it takes as part of the Plaintiff's oversight of Weyerhaeuser's implementation of the Work.

37. Weyerhaeuser shall submit to EPA and to MDEQ two copies (unless otherwise directed by EPA) of the results of all sampling and/or tests or other data obtained or generated by or on behalf of Weyerhaeuser with respect to the Site and/or the implementation of this Consent Decree unless EPA agrees otherwise.

38. Notwithstanding any provision of this Consent Decree, the United States hereby retains all of its information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA and any other applicable statutes or regulations.

## XI. ACCESS AND INSTITUTIONAL CONTROLS

39. If any portion of the Site, or any other property where access and/or land/water use restrictions are needed to implement this Consent Decree, is owned or controlled by persons other than Weyerhaeuser, Weyerhaeuser shall use best efforts to secure from such persons:

a. an agreement to provide access thereto for Weyerhaeuser, as well as for the United States on behalf of EPA, and the State, as well as their representatives (including contractors), for the purpose of conducting any activity related to this Consent Decree;

b. an agreement, enforceable by Weyerhaeuser and the United States, to refrain from using the Site, or such other property, in any manner that would interfere with or adversely

affect the implementation, integrity, or protectiveness of the remedial measures to be performed pursuant to this Consent Decree; and

c.     if EPA requests, the execution and recording with the Allegan County Register of Deeds an easement, running with the land, that grants a right of access for the purpose of conducting any activity related to this Consent Decree. The access rights shall be granted to (i) the United States, on behalf of EPA, and its representatives, (ii) the State and its representatives, and (iii) Weyerhaeuser and its representatives. Within 45 days of EPA's request, Weyerhaeuser shall submit to EPA for review and approval with respect to such property:

(1)     a draft easement, in substantially the form attached hereto as Appendix F, enforceable under the laws of the State of Michigan, and

(2)     a current title insurance commitment, or some other evidence of title acceptable to EPA, which shows title to the land described in the easement to be free and clear of all prior liens and encumbrances (except when those liens or encumbrances are approved by EPA or when, despite best efforts (not to include payment or satisfaction by Weyerhaeuser of any underlying claims or debts), Weyerhaeuser is unable to obtain release or subordination of such prior liens or encumbrances).

40.     Within 15 days of EPA's approval and acceptance of any draft easement or title evidence required under Paragraph 39.c(2), Weyerhaeuser shall update the title search and, if it is determined that nothing has occurred since the effective date of the commitment to affect the title adversely, the easement shall be recorded with the Allegan County Register of Deeds. Within 30 days of the recording of the easement, Weyerhaeuser shall provide EPA with a final title insurance policy, or other final evidence of title acceptable to EPA, and a certified copy of the original recorded easement showing the clerk's recording stamps. If an easement is to be conveyed to the United

States, the easement and title evidence (including final title evidence) shall be prepared in accordance with the U.S. Department of Justice Title Standards 2001, and approval of the sufficiency of title must be obtained as required by 40 U.S.C. § 3111.

41.    For purposes of Paragraph 39 of this Consent Decree, "best efforts" includes the payment of reasonable sums of money in consideration of access, access easements, land/water use restrictions, restrictive easements, and/or an agreement to release or subordinate a prior lien or encumbrance, but does not include payment or satisfaction by Weyerhaeuser of any underlying claims or debts. If (a) any access agreement required by Paragraph 39 of this Consent Decree is not obtained within 45 days of the date of entry of this Consent Decree, (b) any access easements required by Paragraph 39.c of this Consent Decree are not submitted to EPA in draft form within 45 days of the date of EPA's request, or (c) Weyerhaeuser is unable to obtain an agreement pursuant to Paragraph 39 from the holder of a prior lien or encumbrance to release or subordinate such lien or encumbrance to any easement being created pursuant to this Consent Decree within 45 days of the date of entry of this Consent Decree, Weyerhaeuser shall promptly notify the United States in writing, and shall include in that notification a summary of the steps that Weyerhaeuser has taken to attempt to comply with Paragraph 39 of this Consent Decree. The United States may, as it deems appropriate, assist Weyerhaeuser in obtaining access or land/water use restrictions, either in the form of contractual agreements or in the form of easements running with the land, or in obtaining the release or subordination of a prior lien or encumbrance. Weyerhaeuser shall reimburse the United States in accordance with the procedures in Section XVIII (Payments by Weyerhaeuser), for all costs incurred, direct or indirect, by the United States in obtaining such access, land/water use restrictions, and/or the release/subordination of prior liens or encumbrances including, but not limited to, the cost of attorney time and the amount of monetary consideration paid or just compensation.

42.     If EPA determines that land/water use restrictions in the form of State or local laws, regulations, ordinances or other governmental controls are needed to implement the remedy selected in the OU4 ROD or the Mill ROD, ensure the integrity and protectiveness thereof, or ensure non-interference therewith, Weyerhaeuser shall cooperate with EPA's efforts to secure such governmental controls.

43.     Notwithstanding any provision of this Consent Decree, the United States retains all of its access authorities and rights, as well as all of its rights to require land/water use restrictions, including enforcement authorities related thereto, under CERCLA, RCRA and any other applicable statute or regulations.

## XII. REPORTING REQUIREMENTS

44.     In addition to any other requirement of this Consent Decree, unless required on a less frequent basis by EPA, Weyerhaeuser shall submit to EPA and MDEQ three copies of written monthly progress reports during construction and quarterly reports during other activities that: (a) describe the actions which have been taken toward achieving compliance with this Consent Decree during the previous period; (b) include a summary of all results of sampling and tests and all other data received or generated by Weyerhaeuser or its contractors or agents in the previous period; (c) identify all work plans, plans and other deliverables required by this Consent Decree completed and submitted during the previous period; (d) describe all actions, including, but not limited to, data collection and implementation of work plans, which are scheduled for the next six to twelve weeks and provide other information relating to the progress of construction, including, but not limited to, critical path diagrams, Gantt charts and Pert charts; (e) include information regarding percentage of completion, unresolved delays encountered or anticipated that may affect the future schedule for implementation of the Work, and a description of efforts made to mitigate those delays or anticipated

42

delays; (f) include any modifications to the work plans or other schedules that Weyerhaeuser has proposed to EPA or that have been approved by EPA; and (g) describe all activities undertaken in support of the Community Relations Plan during the previous period and those to be undertaken in the next six to twelve weeks. Weyerhaeuser shall submit these progress reports to EPA and MDEQ by the tenth day of the end of the reporting period following the lodging of this Consent Decree until EPA notifies Weyerhaeuser pursuant to Paragraphs 64 or 66 of Section XV (Certifications of Completion), whichever comes later, unless EPA determines otherwise. If requested by EPA, Weyerhaeuser shall also provide briefings for EPA to discuss the progress of the Work.

45.     Weyerhaeuser shall notify EPA of any change in the schedule described in the progress report for the performance of any activity, including, but not limited to, data collection and implementation of work plans, no later than seven days prior to the performance of the activity.

46.     Upon the occurrence of any event during performance of the Work that Weyerhaeuser is required to report pursuant to Section 103 of CERCLA or Section 304 of the Emergency Planning and Community Right-to-know Act (EPCRA), Weyerhaeuser shall within 24 hours of the onset of such event orally notify the EPA Project Coordinator or the Alternate EPA Project Coordinator (in the event of the unavailability of the EPA Project Coordinator), or, in the event that neither the EPA Project Coordinator or Alternate EPA Project Coordinator is available, the Emergency Response Section, Region 5, United States Environmental Protection Agency. These reporting requirements are in addition to the reporting required by CERCLA Section 103 or EPCRA Section 304.

47.     Within 20 days of the onset of such an event, Weyerhaeuser shall furnish to the United States a written report, signed by Weyerhaeuser's Project Coordinator, setting forth the events which occurred and the measures taken, and to be taken, in response thereto. Within 30 days of the conclusion of such an event, Weyerhaeuser shall submit a report setting forth all actions taken in

43

response thereto.

48. Schedules and Submissions

a. All schedules required to be submitted under this Consent Decree shall include information regarding the timing, initiation, and completion of all major milestones for each activity and/or deliverable, including the review and approval of deliverables by EPA. With regard to the due date for revised plans, reports, or other submissions prepared pursuant to Section XIII, the schedules shall reflect that such revised submissions are due within a specified number of days of Weyerhaeuser's receipt of EPA's comments on the submission.

b. Weyerhaeuser shall submit three copies of all plans, reports, and data required by the OU4 SOW, the Mill SOW, the OU4 Remedial Design Work Plan, the Mill Remedial Design Work Plan, the OU4 Remedial Action Work Plan, the Mill Remedial Action Work Plan, or any other approved plans to EPA in accordance with the schedules set forth in such plans. Submissions by Weyerhaeuser shall be deemed to be received as of the date of receipt by EPA, as provided in Paragraph 128, and EPA shall use the date of receipt to determine whether Weyerhaeuser has complied with the schedules set forth in this Consent Decree. Weyerhaeuser shall simultaneously submit two copies of all such plans, reports and data to MDEQ. Upon request by EPA Weyerhaeuser shall submit in electronic form all portions of any report or other deliverable Weyerhaeuser is required to submit pursuant to the provisions of this Consent Decree.

49. All reports and other documents submitted by Weyerhaeuser to EPA (other than the progress reports referred to above) which purport to document Weyerhaeuser's compliance with the terms of this Consent Decree shall be signed by a legally authorized representative or agent of Weyerhaeuser.

44

XIII. APPROVAL OF PLANS AND OTHER SUBMISSIONS

50.　　After review of any plan, report or other item which is required to be submitted for approval pursuant to this Consent Decree, EPA, after reasonable opportunity for review and comment by MDEQ, shall: (a) approve, in whole or in part, the submission; (b) approve the submission upon specified conditions; (c) modify the submission to cure the deficiencies; (d) disapprove, in whole or in part, the submission, directing that Weyerhaeuser modify the submission; or (e) any combination of the above. However, EPA shall not modify a submission without first providing Weyerhaeuser at least one notice of deficiency and an opportunity to cure within 30 days, except where to do so would cause serious disruption to the Work or where previous submission(s) have been disapproved due to material defects and the deficiencies in the submission under consideration indicate a bad faith lack of effort to submit an acceptable deliverable.

51.　　In the event of approval, approval upon conditions, or modification by EPA, pursuant to Paragraph 50(a), (b), or (c), Weyerhaeuser shall proceed to take any action required by the plan, report, or other item, as approved or modified by EPA subject only to its right to invoke the Dispute Resolution procedures set forth in Section XXII (Dispute Resolution) with respect to the modifications or conditions made by EPA. In the event that EPA modifies the submission to cure the deficiencies pursuant to Paragraph 50(c) and the submission has a material defect, EPA retains its right to seek stipulated penalties, as provided in Section XXIII (Stipulated Penalties).

52.　　Resubmission of Plans

a.　　Upon receipt of a notice of disapproval pursuant to Paragraph 50(d), Weyerhaeuser shall, within 30 days or such longer time as specified by EPA in such notice, correct the deficiencies and resubmit the plan, report, or other item as "Final" for approval. Any stipulated penalties applicable to the submission, as provided in Section XXIII (Stipulated Penalties), shall

accrue during the 30-day period or otherwise specified period but shall not be payable unless the resubmission is disapproved or modified due to a material defect as provided in Paragraphs 53 and 54.

b. Notwithstanding the receipt of a notice of disapproval pursuant to Paragraph 50(d), Weyerhaeuser shall proceed, at the direction of EPA, to take any action required by any non-deficient portion of the submission. Implementation of any non-deficient portion of a submission shall not relieve Weyerhaeuser of any liability for stipulated penalties under Section XXIII (Stipulated Penalties).

53. In the event that a resubmitted plan, report or other item, or portion thereof, is disapproved by EPA, EPA may again require Weyerhaeuser to correct the deficiencies, in accordance with the preceding Paragraphs. EPA also retains the right to modify or develop the plan, report or other item. Weyerhaeuser shall implement any such plan, report, or item as modified or developed by EPA, subject only to its right to invoke the procedures set forth in Section XXII (Dispute Resolution).

54. If upon resubmission, a plan, report, or item is disapproved or modified by EPA due to a material defect, Weyerhaeuser shall be deemed to have failed to submit such plan, report, or item timely and adequately unless Weyerhaeuser invokes the dispute resolution procedures set forth in Section XXII (Dispute Resolution) and EPA's action is overturned pursuant to that Section. The provisions of Section XXII (Dispute Resolution) and Section XXIII (Stipulated Penalties) shall govern the implementation of the Work and accrual and payment of any stipulated penalties during Dispute Resolution. If EPA's disapproval or modification is upheld, stipulated penalties shall accrue for such violation from the date on which the initial submission was originally required, as provided in Section XXIII (Stipulated Penalties).

55.     All plans, reports, and other items required to be submitted to EPA under this Consent Decree shall, upon approval or modification by EPA, be enforceable under this Consent Decree. In the event EPA approves or modifies a portion of a plan, report, or other item required to be submitted to EPA under this Consent Decree, the approved or modified portion shall be enforceable under this Consent Decree.


## XIV. PROJECT COORDINATORS

56.     Within 20 days of lodging this Consent Decree, Weyerhaeuser and EPA will notify each other, in writing, of the name, address and telephone number of their respective designated Project Coordinators and Alternate Project Coordinators. If a Project Coordinator or Alternate Project Coordinator initially designated is changed, the identity of the successor will be given to the other Party at least 5 working days before the changes occur, unless impracticable, but in no event later than the actual day the change is made. Weyerhaeuser's Project Coordinator shall be subject to disapproval by EPA and shall have the technical expertise sufficient to adequately oversee all aspects of the Work. Weyerhaeuser's Project Coordinator shall not be an attorney for Weyerhaeuser in this matter. He or she may assign other representatives, including other contractors, to serve as Site representatives for oversight of performance of daily operations during remedial activities at OU4 and the Mill.

57.     The United States may designate other representatives, including, but not limited to, EPA employees, and federal contractors and consultants, to observe and monitor the progress of any activity undertaken pursuant to this Consent Decree. EPA's Project Coordinator and Alternate Project Coordinator shall have the authority lawfully vested in a Remedial Project Manager (RPM) and an On-Scene Coordinator (OSC) by the National Contingency Plan, 40 C.F.R. Part 300. In

addition, EPA's Project Coordinator or Alternate Project Coordinator shall have authority, consistent with the National Contingency Plan, to halt any Work required by this Consent Decree and to take any necessary response action when s/he determines that conditions at the Site constitute an emergency situation or may present an immediate threat to public health or welfare or the environment due to release or threatened release of Waste Material.

58.     EPA's Project Coordinator and Weyerhaeuser's Project Coordinator will meet in person or via conference call, at a minimum, on a bi-monthly basis, unless EPA's Project Coordinator and Weyerhaeuser's Project Coordinator mutually agree to meet on a greater or less frequent basis.

## XV. ASSURANCE OF ABILITY TO COMPLETE WORK

59.     Financial Assurance for the Mill Work and OU4 Work. Exactly $6.2 million of the monies paid to EPA by Weyerhaeuser pursuant to Paragraph 69 (Initial Payments to United States) shall serve as Weyerhaeuser's financial assurance of its ability to perform the OU4 Work, Mill RI/FS, and Mill Work required under this Consent Decree.

60.     If at any time EPA determines that the financial assurances provided by Weyerhaeuser are inadequate to fund the OU4 Work, Mill RI/FS, and Mill Work required under this Consent Decree, Weyerhaeuser shall, within 30 days of receipt of notice of EPA's determination, obtain and present to EPA for approval additional financial assurance.

61.     Additional financial assurance may be in one or more of the following forms:

        a.      a surety bond guaranteeing performance of the Work;

        b.      one or more irrevocable letters of credit equaling the amount specified above and in favor of EPA;

        c.      a trust fund;

48

d.        a guarantee to perform the Work by one or more parent corporations or subsidiaries, or by one or more unrelated corporations that have a substantial business relationship with Weyerhaeuser, and such third party satisfies the requirements of 40 C.F.R. Part 264.143(f); and

e.        a demonstration that Weyerhaeuser satisfies the requirements of 40 C.F.R. Part 264.143(f).

Weyerhaeuser's inability to demonstrate financial ability to complete the Work shall not excuse performance of any of Weyerhaeuser's obligations under this Consent Decree.

62.        Weyerhaeuser may change the form of any additional financial assurance provided under Paragraph 61 at any time, upon notice to and approval by EPA, provided that the new form of assurance meets the requirements of Paragraph 61. In the event of a dispute, Weyerhaeuser may change the form of the financial assurance only in accordance with the final administrative or judicial decision resolving the dispute.

XVI. CERTIFICATIONS OF COMPLETION

63.        Construction of the Mill Remedial Action

a.        Within 90 days after Weyerhaeuser concludes that all phases of the construction of the Mill Remedial Action (excluding Mill O & M), have been fully performed and the applicable Mill Performance Standards (as defined in the approved Mill RA Work Plan and Performance Standard Verification Plan) have been attained, Weyerhaeuser shall schedule and conduct a pre-certification inspection to be attended by Weyerhaeuser, EPA, and MDEQ. If, after the pre-certification inspection, Weyerhaeuser still believes that the Mill Work has been fully performed and the applicable Mill Performance Standards have been attained, Weyerhaeuser shall submit a written report requesting certification to EPA for approval, with a copy to MDEQ, pursuant to Section XIII (Approval of Plans and Other Submissions), within 30 days of the inspection. In the

49

report, a registered professional engineer and Weyerhaeuser's Project Coordinator shall state that the construction of the Mill Remedial Action has been completed in full satisfaction of the requirements of this Consent Decree. The report shall contain the following statement, signed by a responsible corporate official of Weyerhaeuser or Weyerhaeuser's Project Coordinator:

> To the best of my knowledge, after thorough investigation, I certify that the information contained in or accompanying this submission is true, accurate and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

If, after completion of the pre-certification inspection and receipt and review of the written report, EPA, after reasonable opportunity to review and comment by MDEQ, determines that any portion of the Mill Remedial Action has not been completed in accordance with this Consent Decree or that the applicable Mill Performance Standards have not been achieved, EPA will notify Weyerhaeuser in writing of the activities that must be undertaken by Weyerhaeuser pursuant to this Consent Decree to complete the Mill Remedial Action and achieve the Mill Performance Standards, provided, however, that EPA may only require Weyerhaeuser to perform such activities pursuant to this Paragraph to the extent that such activities are consistent with the scope of the remedy selected in the Mill ROD and not including operation, monitoring, and maintenance. EPA will set forth in the notice a schedule for performance of such activities consistent with the Consent Decree and the Mill SOW or require Weyerhaeuser to submit a schedule to EPA for approval pursuant to Section XIII (Approval of Plans and Other Submissions), with a copy to MDEQ. Weyerhaeuser shall perform all activities described in the notice in accordance with the specifications and schedules established

therein, subject to its right to invoke the dispute resolution procedures set forth in Section XXII (Dispute Resolution).

      b.     If EPA concludes, based on the initial or any subsequent request for Certification of Completion by Weyerhaeuser and after a reasonable opportunity for review and comment by MDEQ, that the Mill Remedial Action has been constructed in accordance with this Consent Decree and the applicable Mill Performance Standards have been achieved, EPA will so notify Weyerhaeuser in writing. This certification shall constitute the Certification of Completion of the construction of the Mill Remedial Action for purposes of this Consent Decree, including, but not limited to, Section XXIV (Covenant Not to Sue by the United States). Certification of Completion of the construction of the Mill Remedial Action shall not affect Weyerhaeuser's other obligations under this Consent Decree (including Weyerhaeuser's obligation to conduct O&M pursuant to the Mill ROD).

      64.    Completion of the Mill Work

      a.     Within 90 days after Weyerhaeuser concludes that all phases of the Mill Work (including Mill O & M), have been fully performed, Weyerhaeuser shall schedule and conduct a pre-certification inspection to be attended by Weyerhaeuser, EPA, and MDEQ. If, after the pre-certification inspection, Weyerhaeuser still believes that the Mill Work has been fully performed, Weyerhaeuser shall submit a written report by a registered professional engineer stating that the Mill Work has been completed in full satisfaction of the requirements of this Consent Decree. The report shall contain the following statement, signed by a responsible corporate official of Weyerhaeuser or Weyerhaeuser's Project Coordinator:

    To the best of my knowledge, after thorough investigation, I certify that the information contained in or accompanying this submission is true, accurate and

complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

If, after review of the written report, EPA, after reasonable opportunity to review and comment by MDEQ, determines that any portion of the Mill Work has not been completed in accordance with this Consent Decree, EPA will notify Weyerhaeuser in writing of the activities that must be undertaken by Weyerhaeuser pursuant to this Consent Decree to complete the Mill Work, provided, however, that EPA may only require Weyerhaeuser to perform such activities pursuant to this Paragraph to the extent that such activities are consistent with the scope of the remedy selected in the Mill ROD. EPA will set forth in the notice a schedule for performance of such activities consistent with the Consent Decree and the Mill SOW or require Weyerhaeuser to submit a schedule to EPA for approval pursuant to Section XIII (Approval of Plans and Other Submissions). Weyerhaeuser shall perform all activities described in the notice in accordance with the specifications and schedules established therein, subject to its right to invoke the dispute resolution procedures set forth in Section XXII (Dispute Resolution).

b. If EPA concludes, based on the initial or any subsequent request for Certification of Completion by Weyerhaeuser and after a reasonable opportunity for review and comment by MDEQ, that the Mill Work has been performed in accordance with this Consent Decree, EPA will so notify Weyerhaeuser in writing.

65. Construction of the OU4 Remedial Action

a. Within 90 days after Weyerhaeuser concludes that all phases of the OU4 Remedial Action (excluding OU4 O & M), have been fully performed and the OU4 Performance Standards (as defined in the approved RA and Performance Standard Verification Plan) have been

attained, Weyerhaeuser shall schedule and conduct a pre-certification inspection to be attended by Weyerhaeuser, EPA, and MDEQ. If, after the pre-certification inspection, Weyerhaeuser still believes that the OU4 Remedial Action has been fully performed and the applicable OU4 Performance Standards have been attained, Weyerhaeuser shall submit a written report requesting certification to EPA for approval, with a copy to MDEQ, pursuant to Section XIII (Approval of Plans and Other Submissions) within 30 days of the inspection. In the report, a registered professional engineer and Weyerhaeuser's Project Coordinator shall state that the construction of the OU4 Remedial Action has been completed in full satisfaction of the requirements of this Consent Decree. The report shall contain the following statement, signed by a responsible corporate official of Weyerhaeuser or Weyerhaeuser's Project Coordinator:

> To the best of my knowledge, after thorough investigation, I certify that the information contained in or accompanying this submission is true, accurate and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

If, after completion of the pre-certification inspection and receipt and review of the written report, EPA, after reasonable opportunity for review and comment by MDEQ, determines that any portion of the OU4 Remedial Action has not been completed in accordance with this Consent Decree or that the applicable OU4 Performance Standards have not been achieved, EPA will notify Weyerhaeuser in writing of the activities that must be undertaken by Weyerhaeuser pursuant to this Consent Decree to complete the OU4 Remedial Action and achieve the OU4 Performance Standards, provided, however, that EPA may only require Weyerhaeuser to perform such activities pursuant to this Paragraph to the extent that such activities are consistent with the scope of the remedy selected in

the OU4 ROD and not including operation, monitoring, and maintenance. EPA will set forth in the notice a schedule for performance of such activities consistent with the Consent Decree and the OU4 SOW or require Weyerhaeuser to submit a schedule to EPA for approval pursuant to Section XIII (EPA Approval of Plans and Other Submissions), with a copy to MDEQ. Weyerhaeuser shall perform all activities described in the notice in accordance with the specifications and schedules established therein, subject to its right to invoke the dispute resolution procedures set forth in Section XXII (Dispute Resolution).

       b.      If EPA concludes, based on the initial or any subsequent request for Certification of Completion by Weyerhaeuser and after a reasonable opportunity for review and comment by MDEQ, that the OU4 Remedial Action has been performed in accordance with this Consent Decree and the applicable OU4 Performance Standards have been achieved, EPA will so notify Weyerhaeuser in writing. This certification shall constitute the Certification of Completion of the construction of the OU4 Remedial Action for purposes of this Consent Decree, including, but not limited to, Section XXIV (Covenant Not to Sue by the United States). Certification of Completion of the construction of the OU4 Remedial Action shall not affect Weyerhaeuser's other obligations under this Consent Decree.

      66.      Completion of the OU4 Work

       a.      Within 90 days after Weyerhaeuser concludes that all phases of the OU4 Work (including OU4 O & M), have been fully performed, Weyerhaeuser shall schedule and conduct a pre-certification inspection to be attended by Weyerhaeuser, EPA, and MDEQ. If, after the pre-certification inspection, Weyerhaeuser still believes that the OU4 Work has been fully performed, Weyerhaeuser shall submit a written report by a registered professional engineer stating that the OU4 Work has been completed in full satisfaction of the requirements of this Consent Decree. The report

shall contain the following statement, signed by a responsible corporate official of Weyerhaeuser or Weyerhaeuser's Project Coordinator:

> To the best of my knowledge, after thorough investigation, I certify that the information contained in or accompanying this submission is true, accurate and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

If, after review of the written report, EPA, after reasonable opportunity to review and comment by MDEQ, determines that any portion of the OU4 Work has not been completed in accordance with this Consent Decree, EPA will notify Weyerhaeuser in writing of the activities that must be undertaken by Weyerhaeuser pursuant to this Consent Decree to complete the OU4 Work, provided, however, that EPA may only require Weyerhaeuser to perform such activities pursuant to this Paragraph to the extent that such activities are consistent with the scope of the remedy selected in the OU4 ROD. EPA will set forth in the notice a schedule for performance of such activities consistent with the Consent Decree and the OU4 SOW or require Weyerhaeuser to submit a schedule to EPA for approval pursuant to Section XIII (Approval of Plans and Other Submissions). Weyerhaeuser shall perform all activities described in the notice in accordance with the specifications and schedules established therein, subject to its right to invoke the dispute resolution procedures set forth in Section XXII (Dispute Resolution).

        b.     If EPA concludes, based on the initial or any subsequent request for Certification of Completion by Weyerhaeuser and after a reasonable opportunity for review and comment by MDEQ, that the OU4 Work has been performed in accordance with this Consent Decree, EPA will so notify Weyerhaeuser in writing.

## XVII. EMERGENCY RESPONSE

67.     In the event of any action or occurrence during the performance of the Work which causes or threatens a release of Waste Material from the Mill or OU4 that constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment, Weyerhaeuser shall, subject to Paragraph 68, immediately take all appropriate action to prevent, abate, or minimize such release or threat of release, and shall immediately notify the EPA Project Coordinator, or, if the Project Coordinator is unavailable, EPA's Alternate Project Coordinator. If neither of these persons is available, Weyerhaeuser shall notify the EPA Emergency Response Unit, Region 5. Weyerhaeuser shall take such actions in consultation with EPA's Project Coordinator or other available authorized EPA officer and in accordance with all applicable provisions of the Health and Safety Plans, the Contingency Plans, and any other applicable plans or documents developed pursuant to the Mill SOW or the OU4 SOW, whichever is relevant. In the event that Weyerhaeuser fails to take appropriate response action as required by this Section, and EPA takes such action instead, Weyerhaeuser shall reimburse EPA all costs of the response action not inconsistent with the NCP pursuant to Section XVIII (Payments by Weyerhaeuser).

68.     Nothing in the preceding Paragraph or in this Consent Decree shall be deemed to limit any authority of the United States or the State (a) to take all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Mill or OU4, or (b) to direct or order such action, or seek an order from the Court, to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Mill or OU4, subject to Section XXIV (Covenant Not to Sue by United States).

## XVIII. PAYMENTS BY WEYERHAEUSER

69.     Initial Payments to United States

a.     Within fifteen (15) business days after this Consent Decree has been lodged, Weyerhaeuser will deposit $6,338,851.53 into an escrow account bearing interest at a commercially reasonable rate, in a federally-chartered bank (the "Escrow Account"). Weyerhaeuser shall bear any costs associated with the creation or maintenance of the Escrow Account. If the Consent Decree is disapproved by the Court, and the time for an appeal of that decision has run or if the Court's denial of entry is upheld on appeal, or if the United States withdraws or withholds its consent to the Consent Decree pursuant to Paragraph 136, the monies placed in the Escrow Account, together with accrued interest thereon, will be returned to Weyerhaeuser. If the Consent Decree is approved by the Court with the consent of the United States, and, pursuant to Paragraph 11, EPA notifies Weyerhaeuser that the Allied Paper, Inc./Portage Creek/Kalamazoo River Special Account has been fully funded, then Weyerhaeuser shall pay to EPA the funds in the Escrow Account, including the interest accrued.

b.     Exactly $138,851.53 of the monies paid to EPA pursuant to this Paragraph will be used to reimburse EPA for Past Response Costs. These funds may, in the sole discretion of EPA, be directed to the Allied Paper, Inc./Portage Creek/Kalamazoo River Special Account within the EPA Hazardous Substance Superfund or into any other special account created for response actions at the Site, or may be transferred by EPA into the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site.

c.     All remaining funds (including interest) paid to EPA pursuant to this Paragraph 69 shall be directed to the Kalamazoo River Special Account within the EPA Hazardous Substance Superfund. Upon funding of the Kalamazoo River Special Account, EPA shall draw upon

57

such funds solely to conduct or finance response actions at or in connection with the Kalamazoo River Operable Unit, first and until such time as said funds (excluding interest) have been depleted or such response actions have been completed. Upon completion of response actions at the Kalamazoo River Operable Unit, any funds remaining in the Kalamazoo River Special Account may be transferred by EPA into the EPA Hazardous Substance Superfund or into any other special account created for response actions at the Site, in the sole discretion of EPA. Upon written request by Weyerhaeuser which shall be made no more than once a year, EPA shall provide to Weyerhaeuser an itemized summary of expenditures of funds from the Kalamazoo River Special Account for the previous year.

d.      Payment under this Paragraph 69 will be made by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice account in accordance with current EFT procedures, referencing the USAO File Number, EPA Site/Spill ID 059B, DOJ Case Number 90-11-2-13702/2, and the title and docket number of this civil action. Payment will be made in accordance with instructions provided to Weyerhaeuser by the Financial Litigation Unit of the United States Attorney's Office for the Western District of Michigan (Southern Division) following lodging of this Consent Decree. Any payments received by the Department of Justice after 4:00 p.m. (Eastern Time) will be credited on the next business day.

e.      At the time of payment, Weyerhaeuser shall send notice that payment has been made to the United States, EPA, and the Regional Financial Management Officer.

70.      Payment of Specified Future Response Costs at Mill and OU4

a.      Weyerhaeuser shall pay all Specified Future Response Costs not inconsistent with the National Contingency Plan. On a periodic basis EPA will send Weyerhaeuser a bill requiring payment that includes an itemized cost summary, which reflects direct and indirect costs

incurred by EPA, and a DOJ cost summary which reflects costs incurred by DOJ, if any. Weyerhaeuser shall make all payments within 30 days of Weyerhaeuser's receipt of each bill requiring payment, except as otherwise provided in Paragraph 71. Weyerhaeuser shall make all payments required by this Paragraph by certified or cashier's check or by Electronic Wire Transfer. Payments made by check shall be made payable to "EPA Hazardous Substance Superfund," referencing the name and address of the party making the payment, EPA Site/Spill ID Number 059B, and DOJ Case Number 90-11-2-13702/2. Payment by check shall be sent to: Environmental Protection Agency, Region 5, P.O. Box 70753, Chicago, Illinois 60673 (Attn: Superfund Accounting). Payment by Electronic Wire Transfer shall be sent to EPA's Region 5 lockbox bank, referencing: the name and address of Weyerhaeuser; the Site name; the Mill and OU4; the Site/Spill ID Number 059B; and the EPA docket number for this matter. Payment by wire shall be made in accordance with instructions provided to Weyerhaeuser by EPA after the Effective Date. Payments received via Electronic Funds Transfer at the Region 5 lockbox bank after 11:00 AM (Central Time) will be credited on the next business day.

b.　At the time of payment, Weyerhaeuser shall send notice that payment has been made to the United States, to EPA and to the Regional Financial Management Officer, in accordance with Section XXIX (Notices and Submissions).

c.　All payments received by EPA under Subparagraph 70.a shall be deposited in the Allied Paper, Inc./Portage Creek/Kalamazoo River Special Account or in the Kalamazoo River Special Account within the EPA Hazardous Substance Superfund and shall be retained and used to conduct or finance past and future response actions at or in connection with the Site, or shall be transferred by EPA to the EPA Hazardous Substance Superfund, at the sole discretion of EPA.

71.　<u>Disputes Regarding Specified Future Response Costs</u>. Weyerhaeuser may contest

payment of any Specified Future Response Costs under Paragraph 70 if it determines that the United States has made an accounting error or if it alleges that a cost item that is included represents costs that are inconsistent with the NCP. Such objection shall be made in writing within 30 days of receipt of the bill and must be sent to the United States pursuant to Section XXIX (Notices and Submissions). Any such objection shall specifically identify the contested Specified Future Response Costs and the basis for objection. In the event of an objection, Weyerhaeuser shall within the 30 day period pay all uncontested Specified Future Response Costs to the United States in the manner described in Paragraph 70. Simultaneously, Weyerhaeuser shall establish an interest-bearing escrow account in a federally-insured bank duly chartered in the State and remit to that escrow account funds equivalent to the amount of the contested Specified Future Response Costs. Weyerhaeuser shall send to the United States, as provided in Section XXIX (Notices and Submissions), a copy of the transmittal letter and check paying the uncontested Specified Future Response Costs, and a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account. Simultaneously with establishment of the escrow account, Weyerhaeuser shall initiate the Dispute Resolution procedures in Section XXII (Dispute Resolution). If the United States prevails in the dispute, within 5 days of the resolution of the dispute, Weyerhaeuser shall pay the sums due (with all accrued interest) to the United States in the manner described in Paragraph 70. If Weyerhaeuser prevails concerning any aspect of the contested costs, Weyerhaeuser shall pay that portion of the costs (plus associated accrued interest) for which it did not prevail to the United States in the manner described in Paragraph 70. Weyerhaeuser shall be disbursed any balance of the escrow account. The dispute resolution procedures set forth in this Paragraph in conjunction with the

procedures set forth in Section XXII (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding Weyerhaeuser's obligation to reimburse the United States for its Specified Future Response Costs.

72.    Interest on Untimely Payments.    In the event that the payments required by Paragraph 69.a are not made within the required time frames or the payments required by Paragraph 70.a are not made within 30 days of Weyerhaeuser's receipt of the bill, Weyerhaeuser shall pay Interest on the unpaid balance.  The Interest to be paid on Past Response Costs under this Paragraph shall begin to accrue on the Effective Date.  The Interest on Specified Future Response Costs shall begin to accrue on the date of the bill.  The Interest shall accrue through the date of Weyerhaeuser's payment.  Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to Plaintiffs by virtue of Weyerhaeuser's failure to make timely payments under this Section including, but not limited to, payment of stipulated penalties pursuant to Section XXIII (Stipulated Penalties).  Weyerhaeuser shall pay Interest on payments required by Paragraphs 69 and 70 in accordance with the instructions set forth in those paragraphs.

### XIX. CONSENT DECREE FUNDING

73.    The Parties currently anticipate that the funds to be deposited in the Disbursement Special Account under this Consent Decree (excluding the interest earned on such deposits) will be sufficient to fund the completion of the Work.  In the event those funds are not sufficient to fund the completion of the Work, the insufficiency shall not be considered a force majeure event or a change in circumstances or a basis for seeking non-consensual relief from this Consent Decree pursuant to Fed. R. Civ. P. 60(b), and Weyerhaeuser shall utilize its own funds to complete the Work as required under this Consent Decree.

## XX. INDEMNIFICATION AND INSURANCE

74.     Weyerhaeuser's Indemnification of the United States

        a.     The United States does not assume any liability by entering into this agreement or by virtue of any designation of Weyerhaeuser as EPA's authorized representative under Section 104(e) of CERCLA. Weyerhaeuser shall indemnify, save and hold harmless the United States and its officials, agents, employees, contractors, subcontractors, or representatives for or from any and all claims or causes of action arising from, or are on account of, negligent or other wrongful acts or omissions of Weyerhaeuser, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on its behalf or under its control, in carrying out activities pursuant to this Consent Decree, including, but not limited to, any claims arising from any designation of Weyerhaeuser as EPA's authorized representative under Section 104(e) of CERCLA. Further, Weyerhaeuser agrees to pay the United States all costs it incurs including, but not limited to, attorneys fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States based on negligent or other wrongful acts or omissions of Weyerhaeuser's officers, directors, employees, agents, contractors, subcontractors, and any persons acting on its behalf or under its control, in carrying out activities pursuant to this Consent Decree. The United States shall not be held out as a party to any contract entered into by or on behalf of Weyerhaeuser in carrying out activities pursuant to this Consent Decree. Neither Weyerhaeuser nor any such contractor shall be considered an agent of the United States.

        b.     The United States shall give Weyerhaeuser notice of any claim for which the United States plans to seek indemnification pursuant to Subparagraph 74.a, and shall consult with Weyerhaeuser prior to settling such claim.

        c.     No amount paid for indemnification or reimbursement to the United States

pursuant to Paragraphs 74 or 75 shall be considered a cost of performing the Mill RI/FS, Mill Work, or OU4 Work for purposes of Sections VII, VIII, or IX.

75.     Weyerhaeuser waives all claims against the United States for damages or reimbursement or for set-off of any payments made or to be made to the United States, arising from or on account of any contract, agreement, or arrangement between Weyerhaeuser and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays. In addition, Weyerhaeuser shall indemnify and hold harmless the United States with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between Weyerhaeuser and any person for performance of the Work on or relating to the Site, including, but not limited to, claims on account of construction delays.

76.     No later than 15 days before commencing any on-Site Work, Weyerhaeuser shall secure, and shall maintain, until the first anniversary of EPA's Certification of Completion of the construction of the Mill Remedial Action or Certification of Completion of the construction of the OU4 Remedial Action, whichever is later, pursuant to Paragraphs 63 or 65 respectively of Section XVI (Certifications of Completion), comprehensive general liability insurance with limits of $5 million dollars, combined single limit, and automobile liability insurance with limits of $5 million dollars, combined single limit, naming the United States, on behalf of EPA, as an additional insured. In addition, for the duration of this Consent Decree, Weyerhaeuser shall satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of Weyerhaeuser in furtherance of this Consent Decree. Prior to commencement of the Work under this Consent Decree, Weyerhaeuser shall provide to EPA certificates of such insurance and a copy of each

63

insurance policy. Weyerhaeuser shall resubmit such certificates and copies of policies each year on the anniversary of the Effective Date. If Weyerhaeuser demonstrates by evidence satisfactory to EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, Weyerhaeuser needs to provide only that portion of the insurance described above which is not maintained by the contractor or subcontractor.

## XXI. FORCE MAJEURE

77.     "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Weyerhaeuser, of any entity controlled by Weyerhaeuser, or of Weyerhaeuser's contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Weyerhaeuser's best efforts to fulfill the obligation. The requirement that Weyerhaeuser exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (1) as it is occurring and (2) following the potential force majeure event, such that the delay is minimized to the greatest extent possible. "Force Majeure" does not include financial inability to complete the Mill RI/FS work, Mill Work, or OU4 Work or a failure to attain the Mill Performance Standards or the OU4 Performance Standards.

78.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, Weyerhaeuser shall notify orally EPA's Project Coordinator or, in his or her absence, EPA's Alternate Project Coordinator or, in the event both of EPA's designated representatives are unavailable, the Director of the Superfund Division, EPA Region 5, within 3 days of the time when Weyerhaeuser first knew that the event might cause a delay. Within 5 days thereafter, Weyerhaeuser shall provide in writing

to EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Weyerhaeuser's rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Weyerhaeuser, such event may cause or contribute to an endangerment to public health, welfare or the environment. Weyerhaeuser shall include with any notice all available documentation supporting its claim that the delay was attributable to a force majeure. Failure to comply with the above requirements shall preclude Weyerhaeuser from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Weyerhaeuser shall be deemed to know of any circumstance of which Weyerhaeuser, any entity controlled by Weyerhaeuser, or Weyerhaeuser's contractors knew or should have known.

79. If EPA agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify Weyerhaeuser in writing of its decision. If EPA agrees that the delay is attributable to a force majeure event, EPA will notify Weyerhaeuser in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

80. If Weyerhaeuser elects to invoke the dispute resolution procedures set forth in Section XXII (Dispute Resolution) to dispute an EPA determination that a delay is not attributable to a force

65

majeure event, it shall do so no later than 15 days after receipt of EPA's notice. In any such proceeding, Weyerhaeuser shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Weyerhaeuser complied with the requirements of Paragraphs 77 and 78, above. If Weyerhaeuser carries this burden, the delay at issue shall be deemed not to be a violation by Weyerhaeuser of the affected obligation of this Consent Decree identified to EPA and the Court.

## XXII. DISPUTE RESOLUTION

81.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. The procedures set forth in this Section, however, shall not apply to actions by the United States to enforce obligations of Weyerhaeuser that have not been disputed in accordance with this Section.

82.     Any dispute which arises under or with respect to this Consent Decree shall in the first instance be the subject of informal negotiations between the Parties. The period for informal negotiations shall not exceed 20 days from the time the dispute arises, unless it is modified by written agreement of the Parties. The dispute shall be considered to have arisen when one Party sends the other Party a written Notice of Dispute.

83.     Statements of Position

        a.      In the event that the parties cannot resolve a dispute by informal negotiations under the preceding Paragraph, then the position advanced by EPA shall be considered binding unless, within 5 days after the conclusion of the informal negotiation period, Weyerhaeuser invokes

the formal dispute resolution procedures of this Section by serving on the United States and EPA a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis or opinion supporting that position and any supporting documentation relied upon by Weyerhaeuser. The Statement of Position shall specify Weyerhaeuser's position as to whether formal dispute resolution should proceed under Paragraph 84 or Paragraph 85.

      b.     Within 14 days after receipt of Weyerhaeuser's Statement of Position, EPA will serve on Weyerhaeuser its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by EPA. EPA's Statement of Position shall include a statement as to whether formal dispute resolution should proceed under Paragraph 84 or 85. Within 10 days after receipt of EPA's Statement of Position, Weyerhaeuser may submit a Reply.

      c.     If there is disagreement between EPA and Weyerhaeuser as to whether dispute resolution should proceed under Paragraph 84 or 85, the Parties shall follow the procedures set forth in the paragraph determined by EPA to be applicable. However, if Weyerhaeuser ultimately appeals to the Court to resolve the dispute, the Court shall determine which paragraph is applicable in accordance with the standards of applicability set forth in Paragraphs 84 and 85.

    84.    Record Review. Formal dispute resolution for disputes pertaining to the selection or adequacy of any response action and all other disputes that are accorded review on the administrative record under applicable principles of administrative law shall be conducted pursuant to the procedures set forth in this Paragraph. For purposes of this Paragraph, the adequacy of any response action includes, without limitation: (1) the adequacy or appropriateness of plans, procedures to implement plans, or any other items requiring approval by EPA under this Consent Decree; and (2) the adequacy of the performance of response actions taken pursuant to this Consent Decree. Nothing

in this Consent Decree shall be construed to allow any dispute by Weyerhaeuser regarding the validity of the Mill ROD's or OU4 ROD's provisions.

a.      An administrative record of the dispute shall be maintained by EPA and shall contain all statements of position, including supporting documentation, submitted pursuant to this Section. Where appropriate, EPA may allow submission of supplemental statements of position by the Parties.

b.      The Director of the Superfund Division, EPA Region 5, will issue a final administrative decision resolving the dispute based on the administrative record described in Paragraph 84.a. This decision shall be binding upon Weyerhaeuser, subject only to the right to seek judicial review pursuant to Paragraphs 84.c and d.

c.      Any administrative decision made by EPA pursuant to Paragraph 84.b. shall be reviewable by this Court, provided that a motion for judicial review of the decision is filed by Weyerhaeuser with the Court and served on EPA and the United States within 10 days of receipt of EPA's decision. The motion shall include a description of the matter in dispute, the efforts made by the Parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this Consent Decree. The United States may file a response to Weyerhaeuser's motion.

d.      In proceedings on any dispute governed by this Paragraph, Weyerhaeuser shall have the burden of demonstrating that the decision of the Superfund Division Director is arbitrary and capricious or otherwise not in accordance with law. Judicial review of EPA's decision shall be on the administrative record compiled pursuant to Paragraph 84.a.

85.     Formal dispute resolution for disputes that neither pertain to the selection or adequacy of any response action nor are otherwise accorded review on the administrative record under

applicable principles of administrative law, shall be governed by this Paragraph.

a.      Following receipt of Weyerhaeuser's Statement of Position submitted pursuant to Paragraph 83, the Director of the Superfund Division, EPA Region 5, will issue a final decision resolving the dispute. The Superfund Division Director's decision shall be binding on Weyerhaeuser unless, within 10 days of receipt of the decision, Weyerhaeuser files with the Court and serves on the United States and EPA a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of the Consent Decree. The United States may file a response to Weyerhaeuser's motion.

b.      Notwithstanding Paragraph J of Section I (Background) of this Consent Decree, judicial review of any dispute governed by this Paragraph shall be governed by applicable principles of law.

86.    The invocation of formal dispute resolution procedures under this Section shall not extend, postpone or affect in any way any obligation of Weyerhaeuser under this Consent Decree, not directly in dispute, unless EPA agrees otherwise or the Court so determines. Stipulated penalties with respect to the disputed matter shall continue to accrue but payment shall be stayed pending resolution of the dispute as provided in Paragraph 98. Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this Consent Decree. In the event that Weyerhaeuser does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XXIII (Stipulated Penalties).

## XXIII.  STIPULATED PENALTIES

87.    Weyerhaeuser shall be liable for stipulated penalties in the amounts set forth in Paragraphs 88, 89, 90, 91, and 92 to the United States for failure to comply with the requirements

of this Consent Decree specified below, unless excused under Section XXI (Force Majeure). "Compliance" by Weyerhaeuser shall include completion of the activities under this Consent Decree or any work plan or other plan approved under this Consent Decree identified below in accordance with all applicable requirements of law, this Consent Decree, the Mill SOW, the OU4 SOW, and any plans or other documents approved by EPA pursuant to this Consent Decree and within the specified time schedules established by and approved under this Consent Decree.

88.  Stipulated Penalty Amounts - Failure to Make Payments.  Weyerhaeuser shall be liable for stipulated penalties in the amounts set forth below for each day of violation in which Weyerhaeuser fails to make payments as required under Section XVIII of this Consent Decree:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,500.00 | 1st through 14th day |
| $3,000.00 | 15th through 30th day |
| $5,000.00 | 31st day and beyond |

89.  Stipulated Penalty Amounts – Work

a.  Weyerhaeuser shall be liable for the following stipulated penalties which shall accrue per violation per day for any noncompliance identified in Subparagraph 89.b:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,500.00 | 1st through 14th day |
| $3,000.00 | 15th through 30th day |
| $5,000.00 | 31st day and beyond |

b.  Compliance Milestones

(1)  Failure to submit and, if required by EPA, modify any and all draft and final Remedial Investigation and Feasibility Study Work Plans in accordance with the schedule and

requirements set forth in this Consent Decree;

(2)     Failure to submit and, if required by EPA, modify any and all draft and final Remedial Investigation and Feasibility Study Reports in accordance with the schedule and requirements set forth in this Consent Decree;

(3)     Failure to submit and, if required by EPA, modify any and all draft and final Remedial Design and Remedial Action Work Plans in accordance with the schedule and requirements set forth in this Consent Decree;

(4)     Failure to submit and, if required by EPA, modify any significant deliverables as identified in the EPA approved Remedial Design and Remedial Action Work Plans in accordance with the schedule and requirements set forth in this Consent Decree;

(5)     Failure to implement the approved Remedial Design and Remedial Action Work Plans in accordance with the schedule and requirements set forth in this Consent Decree;

(6)     Failure to submit and, if required by EPA, modify Preliminary Pre-Final and Final Remedial Design and any significant deliverables as identified in the approved Final Remedial Design(s) in accordance with the schedule and requirements set forth in this Consent Decree;

(7)     Failure to complete the Remedial Action(s) required under this Consent Decree, the Mill SOW and the OU4 SOW in accordance with the schedule and requirements set forth in those documents;

(8)     Failure to submit and, if required by EPA, modify the reports required in Section XVI in accordance with the schedule and requirements set forth in this Consent Decree;

(9)     Failure to submit and, if required by EPA, modify the O&M Plan and O&M Manual in accordance with the schedule and requirements set forth in this Consent Decree;

(10)    Failure to perform further response actions and additional Work    in accordance with the schedule and requirements set forth in Sections VII, VIII, IX, and X of this Consent Decree;

90.    <u>Stipulated Penalty Amount - Work Takeover</u>

a.    In the event that EPA assumes performance of a portion of or all of the Mill RI/FS pursuant to Paragraph 107 (Work Takeover), Weyerhaeuser shall be liable for a stipulated penalty in the amount of $50,000.

b.    In the event that EPA assumes performance of a portion of or all of the Mill Work pursuant to Paragraph 107 (Work Takeover), Weyerhaeuser shall be liable for a stipulated penalty in the amount of $250,000.

c.    In the event that EPA assumes performance of a portion of or all of the OU4 Work pursuant to Paragraph 107 (Work Takeover), Weyerhaeuser shall be liable for a stipulated penalty in the amount of $250,000.

91.    Stipulated Penalty Amounts – Other Work Reports and Submissions. The following stipulated penalties shall accrue per violation per day for failure to submit timely or adequate other reports or other written documents pursuant to this Consent Decree:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,000.00 | 1st through 14th day |
| $2,000.00 | 15th through 30th day |
| $3,000.00 | 31st day and beyond |

92.    All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs, and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity.  However, stipulated penalties shall not accrue (1)

with respect to a deficient submission under Section XIII (Approval of Plans and Other Submissions), during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies Weyerhaeuser of any deficiency; (2) with respect to a decision by the Director of the Superfund Division, EPA Region 5, under Paragraph 84.b or 85.a of Section XXII (Dispute Resolution), during the period, if any, beginning on the 21st day after the date that Weyerhaeuser's reply to EPA's Statement of Position is received until the date that the Director issues a final decision regarding such dispute; or (3) with respect to judicial review by this Court of any dispute under Section XXII (Dispute Resolution), during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute. Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Consent Decree.

93. Following EPA's determination that Weyerhaeuser has failed to comply with a requirement of this Consent Decree, EPA may give Weyerhaeuser written notification of the same and describe the noncompliance. EPA may send Weyerhaeuser a written demand for the payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified Weyerhaeuser of a violation or demanded payment.

94. All penalties accruing under this Section shall be due and payable to the United States within 30 days of Weyerhaeuser's receipt from EPA of a demand for payment of the penalties, unless Weyerhaeuser invokes the Dispute Resolution procedures under Section XXII (Dispute Resolution). Weyerhaeuser shall make all payments required by this Paragraph by certified or cashier's check or by Electronic Wire Transfer. Payments made by check shall be made payable to "EPA Hazardous Substance Superfund," referencing the name and address of the party making the payment, EPA Site/Spill ID Number 059B, and DOJ Case Number 90-11-2-13702/2. Payment by check shall be

sent to:  Environmental Protection Agency, Region 5, P.O. Box  70753, Chicago, Illinois  60673 (Attn: Superfund Accounting).  Payment by Electronic Wire Transfer shall be sent to EPA's Region 5 lockbox bank, referencing:  the name and address of Weyerhaeuser; the Site name; the Mill and OU4; the Site/Spill ID Number 059B; and the EPA docket number for this matter.  Payment by wire shall be made in accordance with instructions provided to Weyerhaeuser by EPA after the Effective Date.  Payments received via Electronic Funds Transfer at the Region 5 lockbox bank after 11:00 AM (Central Time) will be credited on the next business day.

95.     The payment of penalties shall not alter in any way Weyerhaeuser's obligation to complete the performance of the Mill RI/FS, Mill Work and the OU4 Work required under this Consent Decree.

96.     No amount paid in stipulated penalties shall be considered a cost of performing the Mill RI/FS, Mill Work, or OU4 Work for purposes of Sections VII, VIII, or IX, nor shall such amount be reported in any cost summary submitted by Weyerhaeuser to EPA.

97.     Penalties shall continue to accrue as provided in Paragraph 92 during any dispute resolution period, but need not be paid until the following:

a.     If the dispute is resolved by agreement or by a decision of EPA that is not appealed to this Court, accrued penalties determined to be owing shall be paid to EPA within 15 days of the agreement or the receipt of EPA's decision or order;

b.     If the dispute is appealed to this Court and the United States prevails in whole or in part, Weyerhaeuser shall pay all accrued penalties determined by the Court to be owed to EPA within 60 days of receipt of the Court's decision or order, except as provided in Subparagraph 97.c below; and

c.      If the District Court's decision is appealed by any Party, Weyerhaeuser shall pay all accrued penalties determined by the District Court to be owing to the United States into an interest-bearing escrow account within 60 days of receipt of the Court's decision or order. Penalties shall be paid into this account as they continue to accrue, at least every 60 days. Within 15 days of receipt of the final appellate court decision, the escrow agent shall pay the balance of the account to EPA or to Weyerhaeuser to the extent that it prevails.

98.     If Weyerhaeuser fails to pay stipulated penalties when due, the United States may institute proceedings to collect the penalties, as well as Interest. Weyerhaeuser shall pay Interest on the unpaid balance, which shall begin to accrue on the date of demand made pursuant to Paragraph 94.

99.     Nothing in this Consent Decree shall be construed as prohibiting, altering, or in any way limiting the ability of the United States to seek any other remedies or sanctions available by virtue of Weyerhaeuser's violation of this Decree or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Section 122(l) of CERCLA, provided, however, that the United States shall not seek civil penalties pursuant to Section 122(l) of CERCLA for any violation for which a stipulated penalty is provided herein, except in the case of a willful violation of the Consent Decree.

100.    Notwithstanding any other provision of this Section, the United States may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this Consent Decree.

## XXIV. COVENANT NOT TO SUE BY UNITED STATES

101.    General Scope of Covenant

a.      As specified by the covenant not to sue contained in Subparagraph 101.b, and subject to the reservations contained in Paragraphs 102, 103, 106, and 108, this Consent Decree is intended to address Weyerhaeuser's alleged liability under Sections 106 and 107(a) of CERCLA for the Mill Work, the OU4 Work, Past Response Costs, and Specified Future Response Costs at OU4 and the Mill and not to address Weyerhaeuser's alleged liability with respect to any other response actions taken or to be taken, or response costs incurred or to be incurred, in connection with the Site.

b.      In consideration of the actions that will be performed by Weyerhaeuser pursuant to this Consent Decree and the payments that will be made by Weyerhaeuser under the terms of the Consent Decree, and except as specifically provided in Paragraphs 102, 103, 106, and 108 of this Section, the United States covenants not to sue or to take administrative action against Weyerhaeuser pursuant to 7003 of RCRA or Sections 106 or 107(a) of CERCLA for the Mill RI/FS, Mill Work, the OU4 Work, Past Response Costs, and Specified Future Response Costs at OU4 and the Plainwell Mill Property.  With respect to Past Response Costs and the OU4 Work except for future liability, these covenants not to sue shall take effect upon receipt by EPA of the payments required by Paragraph 69 of Section XVIII (Payments by Weyerhaeuser).  With respect to the Mill RI/FS, Mill Work, future liability relating to the OU4 Work, and Specified Future Response Costs, these covenants not to sue shall take effect upon EPA's certification of the construction of the Mill Remedial Action and certification of the construction of the OU4 Remedial Action pursuant to Paragraphs 63 and 65 respectively of Section XVI (Certifications of Completion).  These covenants not to sue are conditioned upon the satisfactory performance by Weyerhaeuser of its obligations under this Consent Decree.  These covenants not to sue extend only to Weyerhaeuser and do not extend to any other person.

102. <u>United States' Pre-certification Reservations</u>. Notwithstanding any other provision of this Consent Decree, the United States reserves, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or in a new action, or to issue an administrative order seeking to compel Weyerhaeuser:

a. to perform further response actions relating to the Mill or OU4; or

b. to reimburse the United States for additional costs of response at the Mill or OU4 if, prior to Certification of Completion of the construction of the Mill Remedial Action or the OU4 Remedial Action:

(1) conditions at the Mill or OU4, previously unknown to EPA, are discovered, or

(2) information, previously unknown to EPA, is received, in whole or in part, and EPA determines that these previously unknown conditions or information together with any other relevant information indicates that either the Mill Remedial Action or the OU4 Remedial Action is not protective of human health or the environment.

103. <u>United States' Post-certification Reservations</u>. Notwithstanding any other provision of this Consent Decree, the United States reserves, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or in a new action, or to issue an administrative order seeking to compel Weyerhaeuser:

a. to perform further response actions relating to the Mill or OU4; or

b. to reimburse the United States for additional costs of response at the Mill or OU4 if, subsequent to Certification of Completion of the construction of the Mill Remedial Action or the OU4 Remedial Action:

(1)  conditions at the Mill or OU4, previously unknown to EPA, are discovered, or

(2) information, previously unknown to EPA, is received, in whole or in part, and EPA determines that these previously unknown conditions or this information together with other relevant information indicate that either the Mill Remedial Action or the OU4 Remedial Action is not protective of human health or the environment.

104.    With regard to the provisions in Paragraph 102 pertaining to the Mill, the information and the conditions known to EPA shall include only that information and those conditions known to EPA as of the date the Mill ROD is signed and set forth in the Mill ROD and the administrative record supporting the Mill ROD, including but not limited to information received pursuant to the requirements of Section VII (Performance of Mill Remedial Investigation and Feasibility Study). With regard to those provisions of Paragraph 103 pertaining to the Mill, the information and the conditions known to EPA shall include only that information and those conditions known to EPA as of the date of Certification of Completion of the construction of the Mill Remedial Action and set forth in the Mill ROD, the administrative record supporting the Mill ROD, the post-ROD administrative record for the Mill, or in any information received by EPA pursuant to the requirements of this Consent Decree prior to Certification of Completion of the Mill Remedial Action.

105.    With regard to the provisions in Paragraph 102 pertaining to OU4, the information and the conditions known to EPA shall include only that information and those conditions known to EPA as of the date the OU4 ROD was signed and set forth in the OU4 ROD and the administrative record supporting the OU4 ROD. With regard to the provisions of Paragraph 103 pertaining to OU4, the information and the conditions known to EPA shall include only that

78

information and those conditions known to EPA as of the date of Certification of Completion of the construction of the OU4 Remedial Action and set forth in the OU4 ROD, the administrative record supporting the OU4 ROD, the post-ROD administrative record for OU4, or in any information received by EPA pursuant to the requirements of this Consent Decree prior to Certification of Completion of the construction of the OU4 Remedial Action.

106. <u>General Reservations of Rights</u>. The covenants not to sue set forth above do not pertain to any matters other than those expressly specified in Paragraph 101 above. The United States reserves, and this Consent Decree is without prejudice to, all rights against Weyerhaeuser with respect to all matters not expressly included within the United States' covenant not to sue. Notwithstanding any other provision of this Consent Decree, the United States reserves all rights against Weyerhaeuser with respect to:

a. claims based on a failure by Weyerhaeuser to meet a requirement of this Consent Decree;

b. liability arising from the past, present, or future disposal, release, or threat of release of Waste Material outside of the Site, or on or under any portion of the Site other than the Mill and OU4;

c. liability for future disposal of Waste Material at the Site by Weyerhaeuser, other than as provided in the Mill RI/FS, Mill ROD, the Mill Work, OU4 ROD, the OU4 Work, or otherwise ordered by EPA;

d. liability for damages for injury to, destruction of, or loss of natural resources at the Site, and for the costs of any natural resource damage assessments relating to the Site;

e. criminal liability;

  f.  liability for violations of federal or State law which occur during or after implementation of the Mill RI/FS, the Mill Work, and the OU4 Work;

  g.  liability, prior to Certification of Completion of Construction of the Mill Remedial Action, for additional response actions that EPA determines are necessary to achieve the Mill Performance Standards, but that cannot be required pursuant to Paragraph 23 (Modification of the Mill SOW or Related Work Plans);

  h.  liability, prior to Certification of Completion of Construction of the OU4 Remedial Action, for additional response actions that EPA determines are necessary to achieve the OU4 Performance Standards, but that cannot be required pursuant to Paragraph 31 (Modification of the OU4 SOW or Related Work Plans);

  i.  previously incurred Past Response Costs above the amounts reimbursed pursuant to Paragraph 69;

  j.  liability for any other area or operable unit at the Site, including the Kalamazoo River Operable Unit; and

  k.  liability for costs that the United States will incur related to the Site but are not within the definition of Specified Future Response Costs.

107. Work Takeover

  a.  In the event EPA determines that Weyerhaeuser has ceased implementation of any portion of the Work, is seriously or repeatedly deficient or late in its performance of the Work, or is implementing the Work in a manner which may cause an endangerment to human health or the environment, EPA may assume the performance of all or any portions of the Work as EPA determines necessary.

b.      Weyerhaeuser may invoke the procedures set forth in Section XXII (Dispute Resolution), Paragraph 84 (Record Review), to dispute EPA's determination that takeover of the Mill RI/FS, Mill Work, or OU4 Work is warranted under this Paragraph. Costs incurred by the United States in performing the Work pursuant to this Paragraph shall be considered Specified Future Response Costs that Weyerhaeuser shall pay pursuant to Section XVIII (Payments by Weyerhaeuser).

108.    Notwithstanding any other provision of this Consent Decree, the United States retains all authority and reserves all rights to take any and all response actions authorized by law.

## XXV. COVENANTS BY WEYERHAEUSER

109.    Withdrawal of Objections to Plainwell Settlement Agreement. Within 5 days of the Effective Date, Weyerhaeuser shall withdraw: (i) all claims, contentions, motions, and objections regarding the Plainwell Settlement Agreement in any federal or state court or administrative forum; and (ii) all comments submitted to the United States Department of Justice regarding the Plainwell Settlement Agreement. As of the Effective Date, Weyerhaeuser covenants not to assert or file, in any federal or state court or administrative forum, any claims, contentions, motions, or objections which directly or indirectly pertain to or affect the Plainwell Settlement Agreement.

110.    Covenant Not to Sue. Subject to the reservations in Paragraph 112, Weyerhaeuser hereby covenants not to sue and agrees not to assert any claims or causes of action against the United States with respect to the Mill RI/FS, Mill Work, OU4 Work, Past Response Costs, and Specified Future Response Costs, as defined herein, or this Consent Decree, including, but not limited to:

a.      any direct or indirect claim for reimbursement from the Hazardous Substance Superfund through CERCLA Sections 106(b)(2), 107, 111, 112, 113 or any other provision of law;

81

b.      any claims against the United States, including any department, agency or instrumentality of the United States, under CERCLA Sections 107 or 113 related to OU4 or the Mill;

c.      any claims arising out of response actions at or in connection with OU4 or the Mill, including any claim under the United States Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, as amended, or at common law; or

d.      any direct or indirect claim for disbursement from the Allied Paper, Inc./Portage Creek/Kalamazoo River Special Account, the Kalamazoo River Special Account, or 12th Street Landfill OU#4/Plainwell Mill Property Disbursement Special Account (established pursuant to this Consent Decree), except as provided in Section VI.

111.    Except as provided in Paragraph 114 (Waiver of Claims Against *De Micromis* Parties), Paragraph 115 (Waiver of Claims Against *De Minimis* Parties), and Paragraph 121 (Waiver of Claim-Splitting Defenses), these covenants not to sue shall not apply in the event that the United States brings a cause of action or issues an order pursuant to the reservations set forth in Paragraphs 102, 103, and 106 (b) - (d) or 106 (g) - (j), but only to the extent that Weyerhaeuser's claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

112.    Weyerhaeuser reserves, and this Consent Decree is without prejudice to, claims against the United States, subject to the provisions of Chapter 171 of Title 28 of the United States Code, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States while acting within the scope of his office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.  However, any such claim shall not include a claim for any damages caused, in whole or

82

in part, by the act or omission of any person, including any contractor, who is not a federal employee as that term is defined in 28 U.S.C. § 2671; nor shall any such claim include a claim based on EPA's selection of response actions, or the oversight or approval of Weyerhaeuser's plans or activities. The foregoing applies only to claims which are brought pursuant to any statute other than CERCLA and for which the waiver of sovereign immunity is found in a statute other than CERCLA.

113.    Nothing in this Consent Decree shall be deemed to constitute preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

114.    Weyerhaeuser agrees not to assert any claims and to waive all claims or causes of action that it may have for all matters relating to the Mill and OU4, including for contribution, against any person where the person's liability to Weyerhaeuser with respect to the Mill and OU4 is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at the Mill and OU4, or having accepted for transport for disposal or treatment of hazardous substances at the Mill and OU4, if:

a.    the materials contributed by such person to the Mill and OU4 containing hazardous substances did not exceed the greater of (i) 0.002% of the total volume of waste at the Site, or (ii) 110 gallons of liquid materials or 200 pounds of solid materials.

b.    This waiver shall not apply to any claim or cause of action against any person meeting the above criteria if EPA has determined that the materials contributed to the Mill and OU4 by such person contributed or could contribute significantly to the costs of response at the Mill and OU4. This waiver also shall not apply with respect to any defense, claim, or cause of action that Weyerhaeuser may have against any person if such person asserts a claim or cause of action relating to the Mill and OU4 against Weyerhaeuser.

115.    Weyerhaeuser agrees not to assert any claim and to waive all claims or causes of action that it may have for all matters relating to the Mill and OU4, including for contribution, against any person that has entered into a final CERCLA § 122(g) *de minimis* settlement with EPA with respect to the Site as of the Effective Date. This waiver shall not apply with respect to any defense, claim, or cause of action that Weyerhaeuser may have against any person if such person asserts a claim or cause of action relating to the Site against Weyerhaeuser.

## XXVI.  EFFECT OF SETTLEMENT; CONTRIBUTION PROTECTION

116.    Except as provided in Paragraph 114 (Waiver of Claims Against *De Micromis* Parties) and Paragraph 115 (Waiver of Claims Against *De Minimis* Parties), nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Consent Decree. The preceding sentence shall not be construed to waive or nullify any rights that any person not a signatory to this decree may have under applicable law. Except as provided in Paragraph 114 (Waiver of Claims Against *De Micromis* Parties) and Paragraph 115 (Waiver of Claims Against *De Minimis* Parties), each of the Parties expressly reserves any and all rights (including, but not limited to, any right to contribution), defenses, claims, demands, and causes of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to OU4 or to the Plainwell Mill Property against any person not a Party hereto.

117.    Statutory Contribution Protection. The Parties agree, and by entering this Consent Decree this Court finds, that Weyerhaeuser is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by CERCLA Section 113(f)(2), 42 U.S.C. § 9613(f)(2) for "matters addressed" in this Consent Decree. The "matters addressed" in this Consent Decree are solely the Mill RI/FS, the Mill Work, the OU4 Work, Past Response Costs, and Specified Future Response Costs at OU4 and the Mill. The "matters addressed" in this Consent Decree do not include

response actions or response costs with respect to any other area or operable unit at the Site, including the Kalamazoo River Operable Unit, or those response actions or those response costs as to which the United States has reserved its rights in Paragraph 103, 104, and 106 of this Consent Decree (except for claims for failure to comply with this Consent Decree), in the event that the United States asserts its rights against Weyerhaeuser coming within the scope of any such reservation.

118. Weyerhaeuser agrees and EPA acknowledges that in any future contribution action a portion of the $6.2 million paid by Weyerhaeuser to EPA under this Consent Decree will apply to OU4 and/or the Mill and a portion of those monies will apply to the Kalamazoo River Operable Unit.

119. Weyerhaeuser agrees that with respect to any suit or claim for contribution brought by it for matters related to this Consent Decree it will notify the United States in writing no later than 60 days prior to the initiation of such suit or claim.

120. Weyerhaeuser also agrees that, with respect to any suit or claim for contribution brought against it for matters related to this Consent Decree, Weyerhaeuser will notify in writing the United States within 10 days of service of the complaint on it. In addition, Weyerhaeuser shall notify the United States within 10 days of service or receipt of any Motion for Summary Judgment and within 10 days of receipt of any order from a court setting a case for trial.

121. In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, recovery of response costs, or other appropriate relief relating to the Site, Weyerhaeuser shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph

affects the enforceability of the covenants not to sue set forth in Section XXIV (Covenant Not to Sue by United States).

## XXVII. ACCESS TO INFORMATION

122.    Weyerhaeuser shall provide to EPA, upon request, copies of all documents and information within its possession or control or that of its contractors or agents relating to activities at OU4 and the Mill, or the implementation of this Consent Decree, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information related to the Mill RI/FS, the Mill Work, and the OU4 Work. Weyerhaeuser shall also make available to EPA, for purposes of investigation, information gathering, or testimony, its employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Mill RI/FS, the Mill Work, and the OU4 Work. The United States shall be entitled, upon 30 days notice, to inspect, copy and audit all accounting and other records maintained by Weyerhaeuser, and its contractors and subcontractors, pursuant to Section XII of this Consent Decree.

123.    Business Confidential and Privileged Documents

a.    Weyerhaeuser may assert business confidentiality claims covering part or all of the documents or information submitted to Plaintiff under this Consent Decree to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). Documents or information determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies documents or information when they are submitted to EPA, or if EPA has notified Weyerhaeuser that the documents or information are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such

documents or information without further notice to Weyerhaeuser.

b.     Weyerhaeuser may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If Weyerhaeuser asserts such a privilege in lieu of providing documents, it shall provide EPA with the following: (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of the author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the contents of the document, record, or information: and (6) the privilege asserted by Weyerhaeuser. Nevertheless, no documents, reports or other information created or generated pursuant to the requirements of the Consent Decree shall be withheld on the grounds that they are privileged.

124.    No claim of privilege or confidentiality shall be made with respect to any data, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, or engineering data, or any other documents or information evidencing conditions at or around the Site.

## XXVIII. RETENTION OF RECORDS

125.        Until 10 years after Weyerhaeuser receives notification of Certification or Completion of the Mill Work and Certification of Completion of the OU4 Work pursuant to Paragraph 64.b or 66.b respectively of Section XVI (Certifications of Completion), whichever is later, Weyerhaeuser shall preserve and retain all non-identical copies of records and documents (including records or documents in electronic form) now in its possession or control or which come into its possession or control that relate in any manner to its liability under CERCLA with respect to OU4 or the Plainwell Mill Property, provided, however, that Weyerhaeuser must also retain all documents and records that relate to the liability of any other person under CERCLA with respect

87

to OU4 or the Plainwell Mill Property. Weyerhaeuser must also retain, and instruct its contractors and agents to preserve, for the same period of time specified above all non-identical copies of the last draft or final version of any documents or records (including documents or records in electronic form) now in its possession or control or which come into its possession or control that relate in any manner to the performance of the Work, provided, however, that Weyerhaeuser (and its contractors and agents) must retain, in addition, copies of all data generated during the performance of the Work and not contained in the aforementioned documents required to be retained. Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

126.    At the conclusion of this document retention period, Weyerhaeuser shall notify the United States at least 90 days prior to the destruction of any such records or documents, and, upon request by the United States, Weyerhaeuser shall deliver any such records or documents to EPA. Weyerhaeuser may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If Weyerhaeuser asserts such a privilege, it shall provide Plaintiff with the following:  (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of the author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the privilege asserted by Weyerhaeuser. However, no documents, reports or other information created or generated pursuant to the requirements of the Consent Decree shall be withheld on the grounds that they are privileged.

127.    Weyerhaeuser hereby certifies that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed or otherwise disposed of any records, documents or other information (other than identical copies) relating to its potential liability

88

regarding the Site since notification of potential liability by the United States or the filing of suit against it regarding the Site and that it has fully complied with any and all EPA requests for information pursuant to Section 104(e) and 122(e) of CERCLA, 42 U.S.C. 9604(e) and 9622(e), and Section 3007 of RCRA, 42 U.S.C. 6927.

## XXIX. NOTICES AND SUBMISSIONS

128.    Whenever, under the terms of this Consent Decree, written notice is required to be given or a report or other document is required to be sent by one Party to another, it shall be directed to the individuals at the addresses specified below, unless those individuals or their successors give notice of a change to the other Party in writing.  Whenever a Party is required under this Consent Decree to submit or respond to a plan, report, or other document within a prescribed time frame and the document is sent by U.S. mail or other mail service, four days shall be added to the prescribed time frame to allow adequate time for mail delivery.  All notices and submissions shall be considered effective upon receipt, unless otherwise provided.  Written notice as specified herein shall constitute complete satisfaction of any written notice requirement of the Consent Decree with respect to the United States, EPA, and Weyerhaeuser, respectively.

As to the United States:                         Chief, Environmental Enforcement Section
                                                 Environment and Natural Resources Division
                                                 U.S. Department of Justice
                                                 P.O. Box 7611
                                                 Washington, D.C.  20044-7611
                                                 Re: DOJ # 90-11-2-13702/2

As to EPA:                                       Richard C. Karl
                                                 Director, Superfund Division
                                                 United States Environmental Protection Agency
                                                 Region 5
                                                 77 W. Jackson Blvd.
                                                 Chicago, IL 60604

                                                 Shari Kolak

Remedial Project Manager
United States Environmental Protection Agency
Region 5
77 W. Jackson Blvd. SR-6
Chicago, IL 60604

Eileen L. Furey
Associate Regional Counsel
United States Environmental Protection Agency
Region 5
77 W. Jackson Blvd. C-14J
Chicago, IL 60604

As to the State or MDEQ:

Paul Bucholtz
Environmental Response Division
Michigan Department of Environmental Quality
Constitution Hall
525 West Allegan St.
P.O. Box 30426
Lansing, MI 48909-7926

As to the Regional Financial
Management Officer:

EPA Regional Financial Management Office
Anthony Audia, Chief
Program Accounting and Analysis Section
United States Environmental Protection Agency
Region 5
Mail Code: ML-10C
77 W. Jackson Blvd.
Chicago, IL 60604

As to Weyerhaeuser:

John P. Gross
Senior Environmental Manager
Weyerhaeuser Company
33810 Weyerhaeuser Way S.
Mail Stop EC2-2C1
Federal Way, WA 98001

## XXX. EFFECTIVE DATE

129.    The Effective Date of this Consent Decree shall be the date upon which this Consent

Decree is entered by the Court, except that Weyerhaeuser hereby agrees that it shall be bound upon

the Date of Lodging to comply with obligations of Weyerhaeuser specified in this Consent Decree

as accruing upon the Date of Lodging. In the event the United States withdraws or withholds consent to this Consent Decree before entry, or the Court declines to enter the Consent Decree, then the preceding obligation of Weyerhaeuser to comply with requirements of this Consent Decree upon the Date of Lodging shall terminate.

<div align="center">

XXXI. <u>RETENTION OF JURISDICTION</u>

</div>

130. This Court retains jurisdiction over both the subject matter of this Consent Decree and Parties for the duration of the performance of the terms and provisions of this Consent Decree for the purpose of enabling either of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or modification of this Consent Decree, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section XXII (Dispute Resolution) hereof.

<div align="center">

XXXII. <u>APPENDICES</u>

</div>

131. The following appendices are attached to and hereby incorporated into this Consent Decree:

"Appendix A" is a summary description of OU4.

"Appendix B" is a map generally depicting the location of OU4.

"Appendix C" is the OU4 ROD.

"Appendix D" is a map generally depicting the Site.

"Appendix E" is the draft OU4 SOW, the final form of which shall be in substantially that form.

"Appendix F" is a draft form of easement.

"Appendix G" sets forth the manner in which the Disbursement Special Account shall be managed.

<div align="center">

91

</div>

"Appendix H" is a summary description of the Mill.

### XXXIII. COMMUNITY RELATIONS

132.    Weyerhaeuser shall propose to EPA its participation in the community relations plan to be developed by EPA.  EPA will determine the appropriate role for Weyerhaeuser under the plan. Weyerhaeuser shall also cooperate with EPA  in providing information regarding the Mill Work and OU4 Work to the public.  As requested by EPA, Weyerhaeuser shall participate in the preparation of such information for dissemination to the public and in public meetings which may be held or sponsored by EPA to explain activities at or relating to the Site and/or relating to OU4and the Mill.

### XXXIV. MODIFICATION

133.    Schedules specified in this Consent Decree for completion of the Mill RI/FS, Mill Work, and the OU4 Work may be modified by agreement of EPA and Weyerhaeuser.  All such modifications shall be made in writing.

134.    Except as provided in Paragraphs 23 (Modification of the Mill SOW and Related Work Plans) and 31  (Modification of the OU4 SOW and Related Work Plans), no material modifications shall be made to the Mill RI/FS SOW, the Mill SOW, or the OU4 SOW after issuance of each by EPA, or shall be made to this Consent Decree, without written agreement of the United States and Weyerhaeuser, and the approval of the Court.  Any modification that fundamentally alters the basic features of the selected remedy within the meaning of 40 C.F.R. § 300.435(c)(2)(B)(ii) shall be considered a material modification.  Prior to providing its approval to any material modification, the United States will provide MDEQ with a reasonable opportunity to review and comment on the proposed modification.  Non-material modifications to the Consent Decree may be made by written agreement of the Parties and shall be filed in this Court.  Modifications to the Mill RI/FS SOW, the Mill SOW or the OU4 SOW that do not materially alter those documents, or material modifications

to the Mill RI/FS SOW, the Mill SOW or the OU4 SOW that do not fundamentally alter the basic features of the selected remedy within the meaning of 40 C.F.R.§ 300.435(c)(2)(B)(ii), may be made by written agreement between EPA, after providing MDEQ with a reasonable opportunity to review and comment on the proposed modification, and Weyerhaeuser.

135.    Nothing in this Decree shall be deemed to alter the Court's power to enforce, supervise or approve modifications to this Consent Decree.

## XXXV. LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

136.    This Consent Decree shall be lodged with the Court for a period of not less than fifteen (15) days for public notice and comment in accordance with Section 122(d)(2) of CERCLA, 42 U.S.C. § 9622(d)(2), and 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations which indicate that the Consent Decree is inappropriate, improper, or inadequate. Weyerhaeuser consents to the entry of this Consent Decree without further notice.

137.    If for any reason the Court should decline to approve this Consent Decree in the form presented, this agreement is voidable at the sole discretion of either Party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

## XXXVI. SIGNATORIES/SERVICE

138.    Each undersigned representative of Weyerhaeuser and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind such Party to this document.

139.    Weyerhaeuser hereby agrees not to oppose entry of this Consent Decree by this Court or to challenge any provision of this Consent Decree unless the United States has notified

Weyerhaeuser in writing that it no longer supports entry of the Consent Decree.

140.    Weyerhaeuser shall identify, on the attached signature page, the name, address and telephone number of an agent who is authorized to accept service of process by mail on behalf of Weyerhaeuser with respect to all matters arising under or relating to this Consent Decree. Weyerhaeuser hereby agrees to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including, but not limited to, service of a summons. The Parties agree that Weyerhaeuser need not file an Answer to the Complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

## XXXVII. FINAL JUDGMENT

141.    This Consent Decree and its appendices constitute the final, complete, and exclusive agreement and understanding among the parties with respect to the settlement embodied in the Consent Decree. The parties acknowledge that there are no representations, agreements or understandings relating to the settlement other than those expressly contained in this Consent Decree.

142.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment between the United States and Weyerhaeuser. The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

SO ORDERED THIS 15 DAY OF February, 2005.

/s/ Robert Holmes Bell
United States District Judge

94

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States v. Weyerhaeuser Company, relating to OU4 and the Plainwell Inc. Mill Property at the Allied Paper, Inc./Portage Creek/Kalamazoo River Superfund Site.

**FOR THE UNITED STATES OF AMERICA**

12/15/04

Tom Sansonetti

THOMAS L. SANSONETTI
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Ben Franklin Station
Washington, D.C. 20044-7611

12/20/04

Renita Ford

RENITA Y. FORD
Trial Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Ben Franklin Station
Washington, D.C. 20044-7611
Phone: (202) 305-0232
Fax: (202) 514-0097

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of <u>United States v.</u> <u>Weyerhaeuser Company</u>, relating to OU4 and the Plainwell Inc. Mill Property at the Allied Paper, Inc./Portage Creek/Kalamazoo River Superfund Site.


12/20/04
Date

for Richard C. Karl, Director
Superfund Division
Region 5
U.S. Environmental Protection Agency
77 W. Jackson Blvd.
Chicago, IL 60604


12/18/04
Date

Eileen L. Furey
Associate Regional Counsel
U.S. Environmental Protection Agency
Region 5
77 W. Jackson Blvd.  C-14J
Chicago, IL 60604

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States v. Weyerhaeuser Company, relating to OU4 and the Plainwell Inc. Mill Property at the Allied Paper, Inc./Portage Creek/Kalamazoo River Superfund Site.

FOR WEYERHAEUSER COMPANY

_11-4-04_
Date

Signature: _Patricia M Bedient_
Name (print): _Patricia M Bedient_
Title: _Vice President Strategic Planning_
Address: _33663 Weyerhaeuser Way South_
_Mail Stop CH5B_
_Federal Way WA 98003_

Agent Authorized to Accept Service on Behalf of Above-signed Party:

Name (print): _JOSEPH P. JACKOWSKI_
Title: _SENIOR LEGAL COUNSEL_
Address: _33663 WEYERHAEUSER WAY SOUTH_
_FEDERAL WAY, WA 98003_

Ph. Number: _253-924-3461_